**People of the State of Illinois, Plaintiff-Appellee, v. Patricia Gibbs, Defendant-Appellant.**

**Gen. No. 69–120.**

Second District.

February 9, 1970.

Richard L. Caldwell, of Oregon, for appellant.

John B. Roe, State's Attorney, of Oregon, for appellee.

MR. JUSTICE THOMAS J. MORAN delivered the opinion of the court.

The defendant, Mrs. Patricia Gibbs, was found guilty, by a jury, of reckless conduct and sentenced to a period

of one year. Motions for a new trial and probation were both denied.

On appeal she contends (1) that she was not proved guilty of the offense beyond a reasonable doubt and (2) that the sentence imposed was excessive.

On June 10, 1968, a two-count indictment was returned charging, in the first count, that on December 18, 1967, the defendant committed the offense of Cruelty to Children (Ill Rev Stats 1967, c 23, § 2368) in that she did "willfully and unnecessarily injure in health and limb Michael Patrick Strong, a male child who was under her legal control, by allowing him to fall down the basement stairs on two (2) occasions, and by inflicting or allowing to be inflicted, 18 different bruises upon the body of said Michael Patrick Strong, one bruise being the cause of the death of said Michael Patrick Strong." The second count charged the defendant with the offense of Reckless Conduct (Ill Rev Stats 1967, c 38, § 12-5) in that, on the same day, "she did endanger the bodily safety of Michael Patrick Strong by allowing him to fall down an open stairway to the basement thereby causing his death." The first count is a felony, whereas the second count is a misdemeanor.

Twenty-four witnesses testified at the trial, some of the same persons being called by both the prosecution and defense. Most of the evidence was directed toward the felony charge; however, the jury found the defendant not guilty on this charge. Much of the evidence as to the offense of reckless conduct was circumstantial and there was little conflict.

The evidence is that the defendant, aged 29 and a divorcee, was granted custody of two of her three children—both daughters—ages 7 and 9 years; that she remarried and resides with her present husband; that she was licensed by the Department of Children and Family Services of Illinois to receive into her home

foster children; that she provided such home previously for a child and was evaluated by the Department as having provided a very good foster home; that in October, 1967, the Department placed Michael Strong, then 14 months of age, and his brother, Charles Strong, 2 months of age, in her legal control.

On the evening of December 17, 1967, defendant, along with the four children and her husband, visited the home of one of her husband's brothers and his wife (JoAnne Gibbs); that at this visit Michael seemed happy, was bounced on her brother-in-law's knee, which he enjoyed; and that there appeared to be an abrasion or "chapping" on the face of the child but that he otherwise seemed normal.

At about 8:30 a. m. on December 18, 1967, Bernice Gibbs, another sister-in-law of the defendant, and one who testified for the State and the defense, stopped at defendant's home on her way to purchase postal stamps; that Michael, clad in long pajamas, was in the high chair, eating breakfast and he looked normal; that upon her return from the post office, around 9:00 a. m., she stopped to drop off some postal stamps and saw Michael but did not notice any marks on his face and he again seemed normal; that she frequently visited the defendant's home, that the boy was happy and there existed a reciprocal love between the defendant and the boy.

At about 10:30 a. m., JoAnne Gibbs, while working at a nursing home, received a telephone call from the defendant who stated, "Come quick—Mike has fallen"; that she told her employer, Mrs. Joyce, about the call and stated, "I just can't go," so Mrs. Joyce drove to the home of the defendant; that afterward, thinking of the baby, Chuckie, she called a friend to go to the home of the defendant; the friend reported back that the two children, Mrs. Joyce and the defendant had left for the hospital, so JoAnne then went to the hospital and,

upon arrival, noticed the defendant driving away in Mrs. Joyce's car with the baby; she followed them to the nursing home and at that time, took the baby while the defendant returned to the hospital.

Shortly after arrival at the hospital, Michael was pronounced dead. The family physician testified that he tried to revive the boy, to no avail; that the boy had been dead anywhere from ½ to 3 hours; that he noticed bruises upon the body and, after undressing the youngster, he found the buttocks and scrotum area discolored due to blood hemorrhaging which could have occurred from 8 to 12 (or even 48) hours prior to death; that there were other bruises upon the body; that the scrotum bruise could have been caused by a fall downstairs, coupled with a straddling of a post at the foot of the stairs; that several days previously he had seen the child in his office but did not notice any bruises at that time; that in the many examinations of children, he had never seen a child with so many bruises upon its body; and that the buttocks-scrotum bruises could not have occurred on the morning of death.

The coroner, a licensed veterinarian, testified that he observed Michael at the hospital on the morning of the child's death; that there were numerous bruises about the body; that a certain bruise on one arm appeared to have been placed there by human teeth rather than animal teeth.

Francis Tucker, a pathologist who performed an autopsy upon Michael, took colored photographs which were transferred to slides and shown to the jury. He testified that the cause of death was subdural hemorrhage; that there were 30 or more bruises found upon the body; that the injury to the child's skull, which resulted in death, could have been caused by a fall downstairs and the head having come into contact with the cement floor; that four of the bruises (found on the right cheek, left leg, buttocks and scrotum) had occurred within 24

hours of death, but that all of the other bruises found at various parts of the body, had occurred some 48 hours prior to the child's death. On cross-examination the doctor testified that the large bruise to the scrotum area could have been caused by the child striking a post at the bottom of the stairs while his legs were apart.

Eight witnesses called by the defense testified that the defendant was a good mother, maintained a good home and never, to their knowledge, mistreated either her own children or the foster children in her custody.

The defendant's husband, called by both the State and the defense, testified that he retired about 9:00 p. m. the night before the occurrence and went to work at 5:30 a. m. the next day; that he never saw his wife deliberately inflict pain or suffering upon a child; that she was even-tempered; that Michael was a happy boy; that there was no disturbance during the night; that the basement stairway consisted of 11 steps with, he thought, posts near the bottom on each side; that a foundation post was located about two and one-half to three feet from the bottom of the stairway; that he had been told by defendant when, on an earlier occasion, Michael had fallen partway down the stairs; and that two or three days prior to the occurrence in question, while changing Michael's diaper, he noticed a bruise on his buttocks.

The defendant testified that nothing unusual occurred during the night of December 17; that she awoke about 7:30 a. m. and, after sending her two daughters off to school at 8:30 a. m., she fed Michael and Chuckie; that Bernice Gibbs arrived, stayed for about 15 minutes and returned a short time later to drop off postal stamps; that she then gave Michael and Chuckie their baths; thereafter, she placed Michael in the playpen in the living room; that he commenced fussing so she took him out and let him play on the floor; that she went to the basement to put a load of clothes into the washer and

left the basement door open; that she did not see Michael fall down the stairs, but upon realizing that he had, she picked him up at the bottom of the stairs where he was lying on a rug, ran upstairs to the bathroom and threw cold water on his face; that she next laid him on the kitchen table and applied a cold rag to his face; that she then telephoned JoAnne Gibbs because she could get there the fastest; that Eva Joyce arrived and they, along with the two children, drove to the hospital; that, upon arriving at the hospital, she dropped off Mrs. Joyce and Michael while she took Chuckie to the nursing home; that upon her return to the hospital she was informed of Michael's passing; that Michael had never gone through the basement doorway by himself; that about three weeks previous, while she was helping the boy walk down the stairs, he jerked away from her and fell down two or three steps thereby injuring his back and buttocks; that she did not bite the child; that Michael was a good child but was clumsy and fell a lot; and that when she disciplined the child she would do so with an open hand upon his hands or buttocks but never left any marks on his body as a result.

Upon cross-examination, the defendant testified that she had seen the teethmarks on the boy's arm several days before the occurrence, as well as having noticed other bruises on the arms and legs, but that she had not seen the bruises on the left breast or the buttocks.

Based upon the above facts, the jury, in returning a verdict of not guilty on the first count, determined that the defendant did not inflict, or allow to be inflicted upon the youngster's body, any of the many bruises which occurred prior to December 18, 1967.

■ Whether we agree or disagree with the jury's determination, we are bound by it. Therefore, the sole question which this Court may consider must exclusively regard the second count of the indictment: Can any act

227

or omission on the part of the defendant in allowing the child to fall down the stairs (resulting in specific injuries to the scrotum, buttocks, left leg, right cheek and skull) be construed to be reckless conduct, under the statute?

The only evidence on this point is uncontroverted, as the defendant admitted in her testimony that she knew of the child's proclivity for tripping and falling; that on one occasion, while descending the stairs in her company, the child had pulled away and fallen down part of the stairway; that she left the child out of the playpen, unattended, and that she neglected to close the door leading to the stairway.

It is the State's contention that this evidence is sufficient to constitute reckless conduct. It argues that the case is essentially based upon the credibility of witnesses and, since the jury is the sole judge of the credibility issue, this Court should not disturb the verdict.

The defendant, on the other hand, does not question the credibility of the witnesses or the weight to be given their testimony but, simply stated, contends that all of the evidence pertaining to the second count of the indictment, when viewed in a light most favorable to the State, does not prove the defendant guilty of reckless conduct beyond a reasonable doubt.

Ill Rev Stats 1967, c 38, § 12–5 sets forth the offense of reckless conduct as follows:

"(a) A person who causes bodily harm to or endangers the bodily safety of an individual by any means, commits reckless conduct if he performs recklessly the acts which cause the harm or endanger safety, whether they otherwise are lawful or unlawful.

"(b) Penalty
"A person convicted of reckless conduct shall be fined not to exceed $1,000 or imprisoned in

a penal institution other than the penitentiary not to exceed one year, or both."

Committee Comments (SHA, c 38, § 12–5, pp 714–715) notes that bodily harm is not required and it is sufficient if the conduct is reckless as defined under section 4–6 (Ill Rev Stats 1967, c 38, § 4–6). Section 4–6 defines recklessness:

"A person is reckless or acts recklessly, when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation. An act performed recklessly is performed wantonly, within the meaning of a statute using the latter term, unless the statute clearly requires another meaning."

█ In order, then, to affirm this decision, which would be precedent for future cases, this Court would have to conclude from the remaining limited, evidence before us, that the acts and omissions on the part of the defendant constituted, as a matter of law, a conscious disregard on her part of a substantial and unjustifiable risk and that such disregard amounted to a gross deviation from the standard of care which a reasonable person would exercise in a similar situation, and further, that her actions were wanton.

We cannot so hold.

The only case brought to our attention concerning this particular section of the Criminal Code is People v. Meyers, 94 Ill App2d 340, 236 NE2d 786 (1968). Both the State and the defendant agree that this case is not analogous to the instant case.

The State cites the case of People v. Winstead, 90 Ill App2d 167, 234 NE2d 175 (1967) "as somewhat analogous, although not similar in its facts." In that case the defendant was convicted for the involuntary manslaughter of his 3-year-old stepdaughter. The evidence disclosed that the child's body, as in the instant case, was covered with bruises and abrasions, and that the child died of severe brain damage. The unrebutted medical testimony was to the effect that all of the injuries were incurred no more than 3 to 4 days prior to the child's death. The defendant and his wife testified that some of the child's injuries were sustained when she fell out of bed and that a large lump on the forehead was sustained when she ran into a radiator. The medical testimony refuted the claim that the bump on the forehead could have been caused by contact with a radiator and, in addition, neighbors testified to circumstances which could establish that the defendant could, in fact, have inflicted the injuries sustained by the child. In the instant case, we have no such evidence available to us. In that case, the jury had two hypotheses from which to conclude their verdict; there is no such alternative in the instant case.

There is no evidence in the record to support the fact that the child received its injuries from any other manner than falling down the staircase. Further, we find from the record that it was the defendant herself who established the only theory as to how the injuries occurred. We must, therefore, disagree with the State's contention that credibility of witnesses is an issue since, in this case there is no other hypothesis offered as to how the youngster sustained the more recent injuries.

 A court of review will not reverse the verdict of a jury merely because the evidence is conflicting; however, it is the duty of a reviewing court to reverse whenever the defendant's guilt has not been established be-

230

yond a reasonable doubt. People v. Anderson, 30 Ill2d 413, 415, 197 NE2d 24 (1964).

The question of how the earlier bruises were sustained is left unanswered because of the jury's verdict on Count I.

We are compelled to reverse this case without remand. To hold otherwise would be to interpret the statute to mean that if any person were to leave a child in a room, briefly unattended, and omitted to close a basement door, whether the child was injured or not, such individual would be guilty, not of negligence, but of the offense of reckless conduct. We cannot interpret this to be the intent of the Legislature in adopting this law.

Since, in the trial of this cause, no other error is claimed by which a new trial could be granted, we are bound to reverse the judgment of the trial court for the reasons hereinabove stated.

Judgment reversed.

ABRAHAMSON and SEIDENFELD, JJ., concur.