NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 170256-U

NO. 4-17-0256

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 23, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| ELIZABETH RENEE POTTS, | ) | No. 15CF917 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Robert L. Freitag, |
| | ) | Judge Presiding. |

_____

JUSTICE HARRIS delivered the judgment of the court.
Justice Holder White concurred in the judgment.
Presiding Justice Steigmann dissented.

**ORDER**

¶ 1     *Held*:  The evidence was sufficient to prove defendant guilty of involuntary manslaughter beyond a reasonable doubt.

¶ 2     In November 2016, following a bench trial, defendant, Elizabeth Renee Potts, was found guilty of involuntary manslaughter (720 ILCS 5/9-3(a) (West 2014)), endangering the life or health of a child (720 ILCS 5/12C-5(a)(2) (West 2014)), and obstructing justice (720 ILCS 5/31-4(a)(1) (West 2014)). Defendant asserts that the evidence was insufficient to convict her of involuntary manslaughter because the State failed to establish the mental state of recklessness. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     On July 28, 2015, the State charged defendant by information with one count of

involuntary manslaughter (720 ILCS 5/9-3(a) (West 2014)), one count of endangering the life or health of a child (720 ILCS 5/12C-5(a)(2) (West 2014)), and two counts of obstructing justice (720 ILCS 5/31-4(a)(1) (West 2014)). All of the charges stemmed from the death of defendant's infant daughter, Leah Crafton.

¶ 5    The case proceeded to a bench trial on November 21, 2016. At trial, the State established that, on December 21, 2013, two-month-old Leah was taken to Children's Hospital of Illinois at OSF Saint Francis Medical Center in Peoria, Illinois, after suffering a hypoxic brain injury. The hypoxic brain injury caused severe neurological deterioration and a seizure disorder from which Leah ultimately died on November 23, 2014.

¶ 6    Timothy Crafton, Leah's father and defendant's husband in December of 2013, testified as a witness for the State. Crafton testified that in the evening on December 20, 2013, he and defendant visited a friend at the friend's house. Throughout the evening, Leah was "sleeping in her car seat in the kitchen" and was checked on periodically.

¶ 7    Crafton testified that, at around 1 or 2 a.m., he, defendant, and Leah returned to defendant's house. According to Crafton, prior to leaving, they "put [Leah] in a snowsuit, put a blanket over her in the car." The blanket was "laying over the entire car seat."

¶ 8    After arriving at defendant's house, Crafton went to his own house located a short distance away to get a few items. When he returned to defendant's house, he found defendant in the kitchen and Leah in defendant's bedroom. At that time, according to Crafton, Leah was on defendant's bed, still in her car seat, clothed in her snowsuit, and covered by a blanket. Crafton testified that he checked on Leah by pulling back the blanket to "make sure she was still breathing." According to Crafton, the "visor" of the car seat had been removed and the handle of the car seat was in the "down position" so the blanket covering Leah was "[c]lose to her face." Later, Crafton

- 2 -

explained the blanket was "directly over [Leah's] face" and "on her face." Crafton described the blanket as "plushy *** like a heavy blanket." After he checked on Leah, Crafton then put the blanket back over the car seat, completely covering Leah.

¶ 9        At approximately 3 a.m., defendant and Crafton went to defendant's bedroom to go to sleep. According to Crafton, before the couple got into bed, defendant picked up the car seat in which Leah still slept and placed it in her crib. Defendant and Crafton then went to sleep, leaving Leah in her car seat, clothed in her snowsuit, and with the blanket pulled over her head. Crafton testified that neither he nor defendant discussed the manner in which Leah had been put to bed. Crafton also testified he knew it was improper for Leah to sleep in her snowsuit but was more concerned about her staying asleep so that she would not wake up and cry because he and defendant had to get up early to take Leah to a doctor's appointment.

¶ 10        Crafton testified he and defendant slept until approximately 7 a.m. Upon waking, Crafton immediately noticed something was wrong with Leah. Crafton testified that Leah was "gasping for breath." Crafton woke defendant who then removed Leah from the "car seat and everything that was in it, the snowsuit and blanket and stuff." According to Crafton, before defendant removed Leah from her car seat, the blanket "still completely cover[ed] the car seat." Crafton testified Leah was struggling to breathe, was "really hot," and was "kind of blue." Crafton called 9-1-1 while defendant ran lukewarm water over Leah to try to cool her. Leah was taken to the hospital shortly thereafter.

¶ 11        During the early morning hours of December 22, the couple was questioned by the police regarding the events leading up to Leah's hospitalization. According to Crafton, prior to the interview, defendant "recommended that [they] not tell the truth" to the police. Crafton and defendant "decided that [they] were going to say that [they] put her in the crib on her back." Crafton

testified that, during the December 22 interview, he was untruthful with police when he told them that "we put [Leah] down on her back in the crib." Crafton further testified that he continued to lie to police during subsequent interviews until, finally, in February of 2014, he told the police that Leah had been left to sleep in her car seat.

¶ 12 On cross-examination, defense counsel questioned Crafton about a "very significant incident" that had occurred on October 2, 2013, the day after Leah's birth. Crafton testified, on that date, Leah "stop[ped] breathing" for "about a minute" and her skin turned blue. Leah was taken to the hospital where she remained for several days. Defense counsel also impeached Crafton's testimony that it was defendant who moved Leah to the crib by referencing a statement Crafton had given to police in which Crafton stated that he, not defendant, had moved Leah into her crib. Crafton admitted that he could "not exactly" recall who took responsibility for putting Leah in the crib that night.

¶ 13 The State presented the testimony of Sandra Osman, a neonatal nurse at the hospital where Leah was born. According to Osman, her duties included "ongoing education," including "all safety things—what is safe sleep and car seat, how to put them in the car seat and what is safe for them." Osman testified that she was working on the day of Leah's birth and that, at that time, she was "required" to provide new mothers with safety instructions. Although Osman could not remember what specifically she told defendant, she testified that she always told new mothers that "baby can be overheated" so a baby should be put to sleep only in her pajamas and that a parent should never put "extra blankets in the crib with [the baby]." According to Osman, a baby should wear the same number of layers that the parent wears. Osman further testified that when a baby is in her car seat, she could wear a jacket or snowsuit or be covered by a blanket when being transported to a car, but once inside the car, the jacket, snowsuit, or blanket should be removed.

Regarding safe sleep, Osman testified she always told mothers that babies should be placed on their back to sleep because "[that] is what the SIDS [Sudden Infant Death Syndrome] Foundation says is safe."

¶ 14　　　　　According to Osman, along with the verbal instructions, she also would have provided defendant with an instructional packet titled "Mommy and Me." The packet instructed a parent that, to reduce the risk of SIDS, a parent should:

"Place your baby on his/her back to sleep. ***

Use a firm mattress for sleeping. Do not use fluffy blankets or comforters under the baby. Do not let your baby sleep on a water bed, sheepskin, pillow or other soft material.

Do not let your baby overheat. *** If you need to keep your baby warm, put on more layers of clothing not heavy blankets or comforters that can get pulled over his or her face."

¶ 15　　　　　On cross-examination, Osman acknowledged that children "fall asleep in the car in car seats[.]"

¶ 16　　　　　The State next called Dr. Lucas Pogue, Leah's pediatrician. Dr. Pogue testified that Leah's "[d]evelopment seemed normal" at her first appointment on October 9, 2013. Dr. Pogue also testified about the incident that occurred the day after Leah's birth during which she stopped breathing. Dr. Pogue classified this event as an "acute life-threatening event" (ALTE). His review of Leah's medical records disclosed that the physicians treating Leah for the ALTE were unable to determine its cause and that the only "abnormality" evidenced by the testing performed on Leah was "hypocalcemia, low calcium levels, which was treated with intervenes [*sic*] calcium." Dr. Pogue also testified that Leah's development seemed normal at her subsequent appointments with

him.

¶ 17    According to Dr. Pogue, during Leah's first appointment, he reviewed proper infant care practices with defendant. Among the verbal instructions provided by Dr. Pogue was that, for safe sleep, a baby should "sleep on their back in the same room as the parents." Dr. Pogue also provided defendant with written material that instructed defendant to "[p]lace [her] baby on their back or side (back is preferred) for the first 6 months of life to decrease the risk of [SIDS]."

¶ 18    On cross-examination, Dr. Pogue testified further about the ALTE Leah experienced, explaining that the medical records revealed "[t]here was some question whether there was a seizure that may or may not have been caused by transient low calcium levels." In response to questioning, Dr. Pogue testified there was no determination that the ALTE had been caused by an obstruction in her airway. However, Dr. Pogue opined the ALTE might have been caused by "some aspiration of refluxed food content that blocked the airway temporarily."

¶ 19    The State called Molly Evans, an investigator for the Illinois Department of Children and Family Services (DCFS), to testify regarding a meeting between Evans and defendant on February 6, 2014. The purpose of the meeting was to review a safety plan involving Leah. Evans testified that, during this meeting, defendant told her that on December 21, 2013, Leah "wasn't placed on her back [to sleep]. She was propped up with a small pillow. [Defendant] *** put the pillow behind [Leah's] neck and her back propping her on her left side which is something [defendant claimed she] had done in the past." Evans further testified that, according to defendant, defendant found Leah face down in her crib the next morning.

¶ 20    The State next called Detective Michael Burns of the Bloomington Police Department. Detective Burns testified regarding interviews he conducted with defendant on December 22, 2013, and January 29, 2014. During the interview on December 22, defendant stated

that upon returning home the morning of December 21, 2013, "[defendant] took [Leah] out of the snowsuit, and [Crafton] put her in the crib." Defendant also stated that Leah had been placed on her back and that Leah was on her back when defendant found her the next morning. During the interview on January 29, 2014, defendant stated that when she and Crafton arrived home, they "got [Leah] out of the car seat, put her to bed." When pressed by Detective Burns during the interview that defendant's actions in some way caused Leah's injuries, defendant maintained that there was "no mistake," there was "no accident," and she "didn't do anything."

¶ 21 Detective John Heinlen of the Bloomington Police Department testified regarding an interview with defendant on March 3, 2014. According to Detective Heinlen, defendant requested the interview to "explain the truth and tell what actually did happen" on December 21. During this interview, defendant stated that when she, Crafton, and Leah returned home, Leah was "still in her car seat and [defendant] put her in the crib *** and we never took her out of the [car seat]." She also stated that a "thick *** fleece" blanket was "draped over" the "visor" of the car seat and that two additional blankets covered Leah in the car seat, though the latter two blankets did not cover her face. Defendant was confident the "visor" of the car seat was up and the blanket overlaying Leah was over the "visor" of the car seat. She stated, "I never put a blanket over her like that [*i.e.*, directly on Leah's face]. I always put the visor up first." Defendant did not believe the handle on the car seat was up and was not sure whether Leah was wearing a snowsuit at any point that evening. Defendant said that when she found Leah in the morning, her head was "limp down" in the two blankets in the car seat. Defendant told Detective Heinlen that Crafton and defendant mutually agreed to lie to police before the initial interview on December 22 and that she lied because she "was scared" and "didn't want [Leah] to get taken away." Defendant stated she "didn't know it would happen" and she had seen people allow their babies to sleep in car seats "all

the time," including some babies that were covered by a blanket in a car seat. When defendant lied to police earlier, she "didn't think there was anything wrong with" the way Leah had been allowed to sleep that night but was "really scared" of getting "arrested for something [she] didn't do." Defendant stated she had allowed Leah to sleep in her car seat while wearing a snowsuit and covered by a blanket "a couple of times before" without issue. When asked why defendant left Leah in her car seat overnight, defendant responded "she was comfortable, quiet, she had thrown up a couple times and we didn't feel like waking her up and getting her riled up to puke."

¶ 22 The State called Dr. Channing Petrak as an expert in child abuse pediatrics. Dr. Petrak had evaluated Leah for abusive trauma in December of 2013. After explaining the evaluation she performed on Leah, Dr. Petrak testified regarding the ALTE Leah experienced the day after she was born. Dr. Petrak described an ALTE as an "event that is basically concerning to the parent." According to Dr. Petrak, medical terminology was recently changed to distinguish between "serious events," which are ALTEs, from "very brief episode[s] where the child recovers" which were recently defined as a "brief recoverable unassigned event" (BRUE). Dr. Petrak classified the October 2013 event as a BRUE because it was "brief, and [she] recovered." She hypothesized that Leah's BRUE could have been caused by a "mucous plug" from "mucous left over *** from the birth process" or by "breath holding," which is "not uncommon *** even at that age."

¶ 23 Dr. Petrak further testified that on December 21, 2013, Leah suffered a "hypoxic-ischemic [event]," a "brain injury due to lack of oxygen to the brain," caused by "the unsafe sleep position that her parents described of leaving her in a car seat asleep, in a snowsuit, with heavy blankets over her." Dr. Petrak was confident the cause of the hypoxic-ischemic event was external, stating that "there was no medical reason for [Leah's] hypoxic brain injury." Dr. Petrak explained

- 8 -

that an infant "often will drop their head forward, which can obstruct the airway a little bit" and "they don't always stay exactly where you put them" so "it's not uncommon for them to slide down in their car seat." She further explained that an infant will also "slide down in the snowsuit" and "[i]n a snowsuit *** you're going to have face covering, or snowsuit gets close to the mouth, then you're rebreathing carbon dioxide, which decreases your oxygen level." Finally, "having fleece blankets over baby also would lead to rebreathing carbon dioxide and obstructing [her] oxygen." According to Dr. Petrak, it is not recommended that infants be given blankets when they sleep because the blanket "can frequently obstruct their airway." Dr. Petrak testified "anything near the baby's face increases the rebreathing of [carbon dioxide] and decreases the oxygen level. So even thin blankets up over the baby's face are unsafe for them. That's why we don't recommend them." According to Dr. Petrak, sleeping in a snowsuit and with a blanket over an infant, "particularly when it was for hours, overnight" would "decrease the oxygen to the brain and lead to hypoxic injuries to the brain." Although Dr. Petrak believed Leah's death was caused by the "totality of the circumstances," she also testified either of the individual factors of sleeping in a snowsuit or sleeping with a blanket covering Leah's face was "dangerous" and either one of them could have caused suffocation. Dr. Petrak further opined that, depending on the temperature of the bedroom where Leah slept, the damage to Leah's brain could have been worsened by "hyperthermia" caused by sleeping in a snowsuit and covered by a blanket. When shown a picture of the snowsuit in which Leah slept on December 21, Dr. Petrak classified it as "unsafe for a child to sleep in overnight" due to the risk of suffocation because the child could "wiggle out of it easily, unless it fits really tight. But even then they have the risk of overheating." When shown a picture of the car seat in which Leah slept, Dr. Petrak explained that in such a car seat, an infant "couldn't maintain their head control and airway."

¶ 24   During cross-examination, defense counsel asked Dr. Petrak whether the injury sustained by Leah could have been caused by a second ALTE, to which Dr. Petrak responded, "I don't think there's any way to say." Dr. Petrak further testified on cross-examination that Leah still could have suffered the same injury if the blanket had been "tented" over her car seat because "the car seat is a small area" so if she were left in that condition for "a long extended period of time," she would still be "rebreathing [carbon dioxide]" and, thus, at a risk to suffer a hypoxic brain injury.

¶ 25   On redirect, Dr. Petrak testified further that even if the blanket were tented over the car seat, there was still a risk that Leah would suffocate whether the blanket remained tented over Leah overnight or whether it dropped down on her for some reason, such as Leah's having kicked it.

¶ 26   The State's final witness was Dr. Scott Denton, a forensic pathologist. Dr. Denton testified regarding an autopsy he performed the day after Leah's death. Dr. Denton described Leah's body as "small and maldeveloped." Leah's head was "relatively small compared to her body" and her "frontal bones [were] retracted and small," indicative of "brain atrophy behind her forehead." Dr. Denton's examination of Leah's skull revealed that both her "frontal bones and her occipital bones" were "atrophic" reflecting a "prior injury to the front of her brain, and then *** injury to the back of her brain" that occurred "in the past." According to Dr. Denton, these injuries were caused by a "sudden global brain injury" resulting from "an asphyxial [*sic*] or suffocation type of event." Dr. Denton's examination of Leah's organs revealed multiple additional abnormalities. The abnormalities indicated to Dr. Denton that Leah died of "a seizure or sudden seizure, or seizure disorder" that resulted from asphyxia. Dr. Denton testified that the abnormalities he observed were most likely caused by a gradual depletion of oxygen in Leah's brain, explaining

that, had the asphyxia event been caused by "something sudden[ly] clos[ing] off her mouth and nose," he would not expect Leah to have survived. He ruled out alternative causes of the identified brain damage and concluded that Leah's cause of death was a "seizure disorder due to *** hypoxic-ischemic encephalopathy *** which is a term where basically the brain has been deprived of oxygen due to suffocation within a car seat." According to Dr. Denton, Leah's brain injury from which she ultimately died was consistent with being left "in a snowsuit, in a car seat, with a blanket covering the car seat." He testified

> "Leah Crafton was fine before the car seat incident. So something happened in that car seat, and it's consistent with being in a snowsuit in a confined space. Being in a car seat is a confined space. And whether there's something covering the face directly, or suffocation, or something near causing a close-space asphyxia, where there's rebreathing going on. Either of those are possibilities. Or turning your head where part of the snowsuit will cover your face will, again, create either a seal or it will create a close-space asphyxia."

He further testified that the abnormalities identified during the autopsy would have occurred from either "a progressive close-space asphyxia or *** a sudden complete covering of the mouth and nose, such as overlaying or something like a plastic bag over the face." According to Dr. Denton, Leah could have been asphyxiated "by [a] snowsuit hood itself or a blanket overlying *** her face." Dr. Denton also confirmed that Leah's sleeping in a car seat, in a snowsuit, and with blankets covering her would have caused overheating, which "would exasperate [*sic*] the asphyxia."

¶ 27 During cross-examination, Dr. Denton testified that, other than serving as an enclosed space, "the car seat itself did not cause suffocation." Rather, the car seat provided the "circumstances" and the "main thing was being within a snowsuit, and then being covered in

- 11 -

blankets over the snowsuit. And then having blankets over a car seat certainly wouldn't help. ***
[T]he car seat would actually hold in heat."

¶ 28         The defense presented the testimony of Dr. George Nichols, a forensic pathologist. While Dr. Nichols concurred with Drs. Petrak and Denton that Leah's death was caused by a hypoxic-ischemic event, his opinion differed in that he classified the "December incident" as being "catastrophic" but not "proved to be traumatic." Rather, Dr. Nichols attached significance to the ALTE Leah suffered the day after her birth. Dr. Nichols classified the hypoxic event of December 21, 2013, as a second ALTE in that it was "unexplained despite very intensive medical evaluation." He opined that Leah "incurred neurologic deterioration that proved to be ultimately fatal when she was 13 months old. That's the cause of her death is [*sic*] the second ALTE, from whatever its cause."

¶ 29         Dr. Nichols dismissed the idea that covering a baby in a car seat with a blanket could have caused Leah's injuries, noting that in forming his opinions he "reviewed the literature and could find nothing in the medical literature and nothing in the consumer protective literature to indicate that this was an unsafe practice." He testified that, unless the blanket were "made out of some impervious barrier, plastic laundry bags, garbage bags," a blanket would not "interfere with the movement of air at the child's face." He also testified that he found nothing in the literature he reviewed to indicate a blanket placed over a child in a car seat would cause rebreathing to occur. Dr. Nichols also referenced his own experience as a father, noting that he was confident his children, at some point, "must have been asleep with a blanket over the car seat, and they did just fine." Dr. Nichols also noted that nothing in Leah's medical record indicated she was overheated when she was taken to the hospital on December 21.

¶ 30         On cross-examination Dr. Nichols admitted he "[could] not absolutely exclude that

the catastrophic neurologic event, which occurred to [Leah] was due to asphyxia occurring in a car seat; that [could] only be determined by persons who witnessed the event." Dr. Nichols further acknowledged that, unless a child were securely strapped in a car seat, the child could slide down causing her to suffocate.

¶ 31    After the defense rested, the State recalled Dr. Denton as a rebuttal witness. Dr. Denton testified that Leah's hospitalizations on October 2, 2013, and December 21, 2013, were "completely separate events, separate circumstances." Dr. Denton disagreed with Dr. Nichols that the cause of Leah's hypoxic event on December 21, 2013, was unexplained. Rather, Dr. Denton noted Leah was "apparently healthy" when she was discharged following the October 2 hospitalization and had no "medical problems or events" until she slept overnight in her car seat on December 21. Dr. Denton also disagreed a blanket would have to be "impervious *** for rebreathing to have occurred."

¶ 32    The State next recalled Dr. Petrak as a rebuttal witness. Dr. Petrak also disagreed with Dr. Nichols that the cause of the December 21, 2013, hypoxic event was unexplained. She acknowledged that despite extensive medical evaluation, there was "no medical cause for the hypoxic event that occurred." However, "there was an explanation in that there was a car seat involved, there was a snowsuit involved, and there were blankets involved."

¶ 33    Following closing arguments, the trial court rendered its judgment in an oral ruling. Relevant to the instant appeal, after finding defendant's actions caused Leah's death, the trial court considered whether the evidence established that defendant acted recklessly.

¶ 34    The trial court found that Leah died "from a seizure disorder which was due to an earlier hypoxic event" and that the event was "caused by the condition the child was left in throughout the night in a snowsuit, wrapped in blankets and with a heavy blanket over the car

- 13 -

seat." The court found that "defendant's own actions led to the condition which caused the hypoxia and ultimately caused the death of Leah" and that her actions "ultimately proximately caused the child's death." The court then considered whether the State presented sufficient evidence to prove defendant acted recklessly. The court found that both hospital staff and Dr. Pogue provided defendant with information regarding safe sleeping positions for a baby. The court also found that "[l]eaving such a baby strapped in a car seat, dressed in a snowsuit, wrapped by two blankets and then covered completely by a third thick fleece blanket was clearly not a safe sleeping position or condition." The court found that defendant's knowledge that this sleeping arrangement was unsafe was "evidenced by her lies to the police after this event." The court determined that "[t]he condition that the child was left in absolutely resulted in a substantial and unjustifiable risk that the baby could in fact suffocate." In finding defendant acted recklessly, the court determined that defendant's actions were without justification and that, in taking the actions she did, defendant "consciously disregarded that risk." The court rejected defendant's excuse that she did not place Leah in a proper sleeping position because "she and Mr. Crafton wanted to get some sleep because they had been out late, and they didn't want to wake the child up." The court found that "no reasonable person" would have left Leah in the position in which she was forced to sleep and that "defendant's actions and choice were, in fact, a gross deviation from the standard of care that a reasonable person would have exercised."

¶ 35    The trial court ultimately found defendant not guilty of one count of obstructing justice but guilty of the second count of obstructing justice, endangering the life or health of a child, and involuntary manslaughter.

¶ 36    The trial court denied defendant's motion for a new trial and sentenced her to three years in prison for involuntary manslaughter and a concurrent one-year term for obstruction of

justice.

¶ 37 This appeal followed.

¶ 38                                    II. ANALYSIS

¶ 39 On appeal, defendant asserts that the evidence was insufficient to convict her of involuntary manslaughter because the State failed to establish the mental state of recklessness. Specifically, defendant argues "[t]hough Leah's sleeping conditions were far from ideal, they did not reflect a reckless state of mind on the part of [defendant]" and "[h]er deviation from the standard of care that a reasonable person would exercise was not gross or flagrant and did not reflect a conscious disregard of substantial risks, but merely a negligent failure to be aware of them."

¶ 40 When considering a challenge to the sufficiency of the evidence in a criminal case, the function of a reviewing court is not to retry the defendant. *People v. Lloyd*, 2013 IL 113510, ¶ 42, 987 N.E. 2d 386. Instead, the reviewing court must determine whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *Id.* Under this standard of review, the trier of fact is tasked with resolving conflicts in testimony, weighing the evidence, and drawing reasonable inferences from the facts. *People v. Howery*, 178 Ill. 2d 1, 38, 687 N.E.2d 836, 854 (1997) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The reviewing court may not reverse a conviction "unless the evidence is so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of defendant's guilt." *Lloyd*, 2013 IL 113510, ¶ 42. This is true whether an appeal arises from a bench trial or a jury trial. *People v. Brown*, 2013 IL 114196, ¶ 48, 1 N.E.3d 888.

¶ 41 Defendant was convicted of involuntary manslaughter under section 9-3(a) of the

Criminal Code of 2012 (720 ILCS 5/9-3(a) (West 2014)). "The four elements of involuntary manslaughter are: (1) the defendant must have done an act, which unintentionally (2) caused the death of another and (3) the act, which was such as was likely to cause death or great bodily harm, was (4) performed recklessly." *People v. Smith*, 149 Ill. 2d 558, 563, 599 N.E.2d 888, 890 (1992). A person acts recklessly when she "consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, *** and that disregard constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation." 720 ILCS 5/4-6 (West 2014).

¶ 42                    A. What Caused Leah's Hypoxic Brain Injury?

¶ 43        In her brief, defendant argues that her expert, Dr. Nichols, questioned whether suffocation occurred on December 21, 2013, and, if it did, "was it truly due to a decrease in available oxygen caused by the use of a blanket placed over the infant while in a car seat?" Therefore, we will first examine the evidence as it relates to the cause of Leah's hypoxic brain injury.

¶ 44        Both parties' experts agreed that Leah died from a seizure or a seizure disorder caused by a hypoxic-ischemic event that occurred on December 21, 2013. The experts disagreed, however, on the cause of the hypoxic-ischemic event. Dr. Petrak testified that the hypoxic-ischemic event was caused by "the unsafe sleep position that her parents described of leaving her in a car seat asleep, in a snowsuit, with heavy blankets over her." Dr. Petrak did not specify whether it was the snowsuit or the blanket that caused the hypoxic-ischemic event, instead testifying Leah asphyxiated due to the "totality of the circumstances." However, she further testified that either the blanket or the snowsuit *individually* could have caused suffocation. According to Dr. Petrak, the snowsuit could have caused Leah to asphyxiate either by covering her face or by being "close

- 16 -

to the mouth," causing her to rebreathe carbon dioxide. Similarly, the blanket could have obstructed Leah's oxygen intake or caused her to rebreathe carbon dioxide, depending on the blanket's proximity to her face.

¶ 45        Dr. Denton testified that, in his opinion, the cause of Leah's asphyxia was something "covering [her] face directly," thus causing suffocation, or "something near [her face]," thus causing rebreathing of carbon dioxide. According to Dr. Denton, either the hood of Leah's snowsuit or the blanket over her face could have caused suffocation or rebreathing of carbon dioxide.

¶ 46        Dr. Nichols rejected the possibility that Leah's hypoxic brain injury had been caused by a blanket covering her face, stating that unless the blanket were made of some "impervious barrier," it would not have interfered with her ability to breathe. Instead, Dr. Nichols testified that because the hypoxic-ischemic event was "unexplained despite very intensive medical evaluation," it was a second ALTE. As noted, Dr. Petrak and Dr. Denton rebutted Dr. Nichols's testimony, testifying that Leah's face being covered by the snowsuit or blanket adequately explained the hypoxic event. Dr. Denton also testified that a blanket need not be impervious to cause rebreathing of carbon dioxide.

¶ 47        Viewing the evidence in the light most favorable to the State, we find the trial court could have concluded that the hypoxic-ischemic event was due to Leah's breathing being obstructed either by the snowsuit in which she slept or the blanket covering her face, and not by some supervening event, *i.e.*, an ALTE.

¶ 48                          B. Did Defendant Act Recklessly?

¶ 49        We first examine whether the evidence at trial was sufficient for a rational trier of fact to find the risk of suffocation was both substantial and unjustified. Dr. Petrak characterized

- 17 -

defendant's act of putting Leah to bed in her snowsuit and with a blanket over her face as "dangerous." She explained that, in a car seat, an infant often will drop her head forward and slide down from the position in which she is placed. When shown a photograph of the snowsuit Leah wore on December 21, 2013, Dr. Petrak testified that, unless the snowsuit fit tightly, an infant could "wiggle out of it easily." According to Dr. Petrak, following these movements, "you're going to have face covering, or *** rebreathing." Dr. Petrak testified the risk was particularly great where an infant sleeps in a car seat while wearing a snowsuit for multiple hours. Dr. Denton also testified that Leah could have suffocated or rebreathed carbon dioxide just by turning her head into the snowsuit she wore. Dr. Petrak also testified that having a blanket over Leah's face would lead to her rebreathing carbon dioxide, especially over the course of several hours. Dr. Petrak testified "anything near the baby's face increases the rebreathing of [carbon dioxide] and decreases the oxygen level" and "even thin blankets up over the baby's face are unsafe for them." The only explanation provided by defendant in defense of her actions was that she did not want to "wak[e] [Leah] up and get[ ] her riled up to puke." We find the evidence supports the trial court's conclusion that the risk of suffocation was substantial and unjustified.

¶ 50         We next address whether a rational trier of fact could have found defendant *consciously disregarded* a substantial and unjustifiable risk of Leah suffocating; in other words, whether defendant acted recklessly. "A mental state is seldom proved by direct evidence and must generally be inferred from the surrounding circumstances." *People v. Lissade*, 403 Ill. App. 3d 609, 613, 935 N.E.2d 1041, 1044 (2010). "Unless the inference of mental state accepted by the trier of fact is inherently impossible or unreasonable, its determination of this issue should not be disturbed." *In re Thur*, 80 Ill. App. 3d 592, 596, 400 N.E.2d 564, 567 (1980).

¶ 51         Here, we find the evidence was sufficient to support the inference that defendant

acted recklessly by consciously disregarding a risk of suffocation when she put Leah to bed in her car seat while still in her snowsuit and with a blanket covering her face. In her interview with the police on December 22, 2013, defendant fabricated a story in which she stated she took Leah out of her car seat, removed her snowsuit, and placed her on her back in her crib when she put Leah to bed. Defendant maintained this false narrative when she was interviewed again by the police on January 29, 2014. Defendant also lied to a DCFS investigator on February 6, 2014, telling the investigator she put Leah in her crib on her left side and placed a pillow behind her neck and back, and found Leah face down in her crib the next morning.

¶ 52        The trial court found that "[l]eaving such a baby strapped in a car seat, dressed in a snowsuit, wrapped by two blankets and then covered completely by a third thick fleece blanket was clearly not a safe sleeping position or condition. The Court believes and finds that the defendant knew this as evidenced by her lies to the police after this event." As argued by the State, defendant's lies to authorities could be viewed by the court as attempts to diminish her culpability and as an indication of consciousness of guilt. *People v. Watson*, 103 Ill. App. 3d 992, 995, 431 N.E.2d 1350, 1353 (1982) ("A defendant's false exculpatory statement has independent probative value as evidence of consciousness of guilt[.]").

¶ 53        Additionally, during her interview with Detective Heinlen, defendant stated she would "never" put a blanket directly over Leah's face but instead always made sure the "visor" of the car seat was up so as to ensure the blanket was suspended over Leah and not laying on her. Although defendant did not explain why she made sure blankets were not covering Leah's face, viewed in the light most favorable to the State, a rational trier of fact could infer from her statement that she understood that doing otherwise was dangerous—that Leah could suffocate if a blanket covered her face for an extended period of time. Such an inference is not "inherently impossible

or unreasonable." *Thur*, 80 Ill. App. 3d at 596. Thus, we find this evidence additionally supports an inference that defendant acted recklessly in allowing Leah to sleep in her car seat for a period of four hours with a heavy blanket covering her face.

¶ 54    The dissent argues that in order to establish defendant "consciously disregarded" a risk of suffocation, it was necessary for the State to present direct evidence of defendant's awareness of the risk—that she was "specifically told" by someone such harm might follow, and that she understood and remembered this on the date of the incident. *Infra* ¶¶ 80, 88. As an initial matter, the dissent's argument ignores that the mental state of "recklessness" is generally inferred from the surrounding circumstances. Thus, defendant's conscious disregard of a risk of suffocation was more likely to be established inferentially than by direct evidence. As discussed above, we believe defendant's false statements to the police and DCFS, as well as her implicit acknowledgment to Detective Heinlen that it would be dangerous to cover a baby's face with a blanket—stating that she always made sure the "visor" of the car seat was up to prevent this— support an inference that defendant was aware her actions posed a substantial and unjustifiable risk of suffocation *and* that she consciously disregarded the risk.

¶ 55    The dissent goes on to assert the evidence was insufficient because proof of a defendant's conscious disregard of a risk "requires a subjective analysis, not an objective one," where the focus is "on what the evidence showed defendant knew or understood, not on what some other person might have known or understood" under the circumstances. In support, the dissent cites to the Supreme Court's decision in *Farmer v. Brennan*, 511 U.S. 825, 837 (1994), in which the Court determined that a finding of criminal recklessness may be found "only when a person disregards a risk of harm *of which he is aware*." (Emphasis added.) The Supreme Court determined a subjective, not objective, analysis of risk was appropriate in that case.

¶ 56        For two reasons we disagree with the dissent that *Farmer* requires a finding that the State failed to prove recklessness in this case. First, as discussed previously, defendant's *actual awareness* of the risk of suffocation could be inferred from the evidence of her false statements to the authorities and statement to Detective Heinlen. Second, we note that the Supreme Court in *Farmer* went on to explain that "the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence [citation], and a factfinder may conclude that a [defendant] knew of a substantial risk *from the very fact that the risk was obvious*." (Emphasis added.) *Id.* at 842. In other words, direct evidence establishing a defendant's actual awareness of a risk is *not* necessary where the risk itself is obvious. Thus, according to *Farmer*, even from a *subjective* standpoint, a defendant's awareness of a risk may be inferred from circumstantial evidence which demonstrates the risk was obvious.

¶ 57        In accord with *Farmer*, we find that defendant's awareness of the risk in this case—the risk of suffocation inherent in allowing an infant to sleep in her car seat for a period of four hours with a heavy blanket covering her face—could be inferred "from the very fact that the risk was obvious." *Id.* As the trial court stated, "[l]eaving [a two-month-old] baby strapped in a car seat, dressed in a snowsuit, wrapped by two blankets and then covered completely by a third thick fleece blanket was *clearly* not a safe sleeping position or condition." (Emphasis added). It is apparent that the court found the risk to Leah was obvious and we will not disturb its finding.

¶ 58        Defendant cites to *People v. Gibbs*, 119 Ill. App. 2d 222, 255 N.E.2d 486 (1970) in support of her argument that she did not act recklessly. In that case, a 14-month-old child was placed in the foster care of the defendant. *Id.* at 224. On the day of the incident, the defendant allowed the child to play outside of his playpen while she went to the basement to wash clothes. *Id.* at 226. However, the defendant failed to close the door to the basement when she went

- 21 -

downstairs. *Id.* at 227. The child subsequently fell down the stairs and suffered fatal injuries. *Id.* At trial, the defendant admitted she knew the child was "clumsy and fell a lot" and that, a few weeks prior to the fall, the child had fallen down the same stairs. *Id.* Defendant was convicted of the offense of reckless conduct. *Id.* at 222. The appellate court in *Gibbs* reversed, indicating it was unwilling to interpret the definition of recklessness to mean that "if any person were to leave a child in a room, briefly unattended, and omitted to close a basement door, whether the child was injured or not, such individual would be guilty of *** the offense of reckless conduct." *Id.* at 231.

¶ 59        We find *Gibbs* to be of limited value to our analysis. In *Gibbs*, the defendant's omission was one involving momentary inattentiveness. This brief lapse in attention by the *Gibbs* defendant did not necessarily point to a "conscious disregard on her part of a substantial and unjustifiable risk" sufficient to constitute reckless conduct. *Id.* at 229. In comparison, defendant's affirmative act in this case consisted of putting her infant daughter to bed in a car seat with a heavy blanket covering her face despite the obvious risk of suffocation. Leah remained in this position for four hours until Crafton awoke to find the baby "gasping for breath."

¶ 60        We find *People v. Kolzow*, 301 Ill. App. 3d 1, 703 N.E.2d 424 (1998), more closely resembles this case. In *Kolzow*, the defendant was convicted of involuntary manslaughter after she left her infant in a car for four hours resulting in his death from heat stroke. *Id.* at 2. On appeal, the defendant argued the evidence was insufficient to establish recklessness "because she was a new mother, she was unaware of the danger of leaving the child unattended in the car, and *** there was no indication she knew how high the temperature in the car could get." *Id.* at 6. The court rejected the defendant's argument, finding "a reasonable person would be aware of the risks in leaving a three-month-old infant unattended in a parked car for four hours on a summer day, and *** defendant acted recklessly by consciously disregarding that clear and obvious risk." *Id.* at 6-

7.

¶ 61        We recognize that the *Kolzow* court's use of the words "reasonable person" in analyzing defendant's awareness of the risk might suggest that, contrary to *Farmer*, it applied an objective analysis instead of a subjective analysis of the defendant's awareness of the risk. However, its subsequent finding that the risk in that case was "clear and obvious" indicates the trier of fact could, in the absence of direct evidence that defendant knew of the risk, *infer* the defendant's awareness "from the very fact the risk was obvious." *Farmer*, 511 U.S. at 842.

¶ 62        As in *Kolzow*, the risk in the present case could fairly be characterized as obvious such that defendant's awareness of it could be inferred from the circumstances, and her subsequent disregard of such risk constituted a gross deviation from the standard of care a reasonable person would have exercised. Accordingly, we cannot say that an inference that defendant acted recklessly was "inherently impossible or unreasonable." *Thur*, 80 Ill. App. 3d at 596.

¶ 63                                  III. CONCLUSION

¶ 64        In conclusion, we agree with the trial court that there is "no question based on [the] evidence that the death of [Leah] was unintentional," and that the circumstances were "tragic" and "overwhelmingly sad." However, after considering the evidence in the light most favorable to the prosecution, a rational trier of fact could have found that defendant acted recklessly. Thus, we find the evidence presented was not so improbable, unsatisfactory, or inconclusive as to create a reasonable doubt of defendant's guilt of involuntary manslaughter.

¶ 65        Affirmed.

¶ 66        PRESIDING JUSTICE STEIGMANN, dissenting.

¶ 67        In order to prove defendant guilty of involuntary manslaughter, the State needed to prove beyond a reasonable doubt that she *consciously disregarded* a substantial and unjustifiable

risk that circumstances existed regarding the care of her infant daughter, Leah, that ultimately resulted in Leah's death. Because I believe the State's evidence failed to meet its burden of proof, I respectfully dissent.

¶ 68                              I. WHAT DOES CONSCIOUS DISREGARD MEAN?

¶ 69              In *People v. Eubanks*, 2019 IL 123525, ¶ 74, the Supreme Court of Illinois recently discussed the offense of involuntary manslaughter as follows:

> "[A] defendant commits involuntary manslaughter when he performs acts that are likely to cause death or great bodily harm to another and he performs these acts recklessly. 720 ILCS 5/9-3(a) (West 1994). Recklessness is statutorily defined:
>
> > 'A person is reckless or acts recklessly, when he *consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow*, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation.' (Emphasis added.) 720 ILCS 5/4-6 (West 1994).
>
> In general, a defendant acts recklessly when he is aware that his conduct might result in death or great bodily harm, although that result is not substantially certain to occur." (Emphasis in original.)

¶ 70              Whether a defendant has *consciously disregarded* a substantial and unjustifiable risk requires a subjective analysis, not an objective one. By that I mean this court's focus must be on what the evidence showed defendant knew or understood, not on what some other person might have known or understood in the circumstances of this case.

¶ 71              The United States Supreme Court has provided some guidance regarding the

difference between a subjective analysis and an objective one as follows:

> "The civil law generally calls a person reckless who acts or (if the person has a duty to act) fails to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known. [Citations.] The criminal law, however, generally permits a finding of recklessness only when a person disregards a risk of harm *of which he is aware*." (Emphasis added.) *Farmer*, 511 U.S. at 836-37.

¶ 72      In footnote 18 of *Safeco Insurance Company of America v. Burr*, 551 U.S. 47, 68 n.18 (2007), the Supreme Court cited its earlier decision in *Farmer* and wrote the following: "Unlike civil recklessness, criminal recklessness also requires subjective knowledge on the part of the offender."

¶ 73      For the reasons that follow, I conclude that the evidence in this record falls far short of demonstrating that *this defendant* consciously disregarded a substantial and unjustifiable risk regarding Leah's care.

¶ 74               II. THE CAUSE OF LEAH'S DEATH

¶ 75      A complicating factor in this case is that the State's two experts, Drs. Petrak and Denton, were not even clear about the cause of Leah's death. That is, they did not identify whether it was the car seat, the snowsuit, the blanket covering Leah, or some combination of these factors that caused her hypoxic episode and consequent catastrophic brain damage and death.

¶ 76      A troubling fact in this case is that it appears Leah's cause of death may be due—at least in part—to her slipping down in her car seat and suffocating. But what evidence is there in this record that even *suggests* any medical personnel warned defendant of that danger—namely, that a child sleeping for an extensive period of time in a car seat might slip down and have trouble

- 25 -

breathing as a result?

¶ 77       Regarding the car seat, Dr. Petrak testified that Leah's brain injury was due to unsafe sleep positions as described by her parents—namely, being strapped into a car seat in a heavy snowsuit with a fleece blanket over her. Dr. Petrak further explained, as follows:

> "So an infant that age *** their head control is not great. They often will drop their head forward, which can obstruct the airway a little bit ***. So it's not uncommon for them to slide down in their car seat. In a snowsuit in particular, you're going to have face covering or snowsuit gets close to the mouth, then you're rebreathing carbon dioxide, which decreases oxygen level. And then having fleece blankets over the baby would also lead to rebreathing carbon dioxide and obstructing your oxygen. And all of those, the combination of those, are going to decrease the oxygen to the brain and lead to hypoxic injuries to the brain."

¶ 78       Significant for the choice of words Dr. Petrak used, he also testified that the combination of car seats and snowsuits *is not recommended* because a snowsuit prevents the car seat straps from being tightened sufficiently to keep an infant in place." (Emphasis added.) But *not recommended* is far short of dangerous and life-threatening.

¶ 79       Dr. Denton, an independent forensic pathologist who was the State's second expert witness, conducted an autopsy on Leah's body and found no indications of physical abuse or malnourishment. He concluded that Leah's death was attributable to a "seizure disorder due to hypoxic ischemic encephalopathy due to suffocation in a car seat." He testified that either the snowsuit hood or the blanket overlying the snowsuit could have caused Leah's exophasia-related injuries, as well as causing the overheating that exacerbated her exophasia, but he explained that the car seat was still problematic because the child could slide down the seat and her breathing

could be obstructed by the straps.

¶ 80    So, it seems to me that the focus both at trial and before this court should be on (1) the danger of leaving an infant in a car seat for an excessive amount of time and (2) what defendant was told about such danger—that is, was she specifically told that doing so threatened her child's life.

¶ 81    III. WHAT WAS DEFENDANT TOLD ABOUT THE CARE OF HER BABY?

¶ 82    Defendant was a 19-year-old, first-time mother who received general instructions from the hospital regarding Leah's care when defendant brought Leah home shortly after her birth.

¶ 83    Nurse Osman testified that she "typically informed new mothers" that a baby can overheat, so mothers should never place extra blankets in a crib, and they should have their babies sleep only in pajamas. But, again, the evidence is not clear that defendant actually received any such instruction, and even if she had, how were these instructions presented? This situation suggests the dichotomy of "best practices" on the one hand and "life-threatening behavior" on the other. Nothing in this record shows that defendant was told that placing extra blankets in a crib could threaten the baby's life (assuming, for the moment, that those extra blankets in fact were a contributing factor in Leah's death).

¶ 84    The majority refers to Osman's testimony that she provided ongoing education for new parents, including "all safety things—what is safe sleep and car seat, how to put them in the car seat, *** and what is safe for them." *Supra.* ¶ 13. These instructions, assuming they were even given to defendant, seem far short of cautioning defendant that her infant could suffocate if she spent an excessive amount of time in a car seat.

¶ 85    Given that the State's expert, Dr. Denton, opined that the excessive time Leah spent in the car seat caused her death due to hypoxia, one would think that a new parent like defendant

would have been cautioned to never let her infant spend an excessive amount of time in a car seat. However, nothing specifically concerning car seat safety appears to have been emphasized in any instructions to defendant.

¶ 86                    IV. WHAT DID DEFENDANT KNOW AND UNDERSTAND

ABOUT THE CARE OF HER BABY?

¶ 87            To affirm defendant's conviction for involuntary manslaughter in this case, the evidence must prove beyond a reasonable doubt that she *was aware* that her conduct might result in death or great bodily harm, even if that result was not substantially certain to occur. I do not see how the evidence on this record meets that standard.

¶ 88            The majority makes much of the fact that defendant received instructions from medical personnel regarding the care of newborns and how those babies should "sleep on their back in the same room as the parents." *Supra.* ¶ 17. But I find that evidence to be manifestly insufficient because, before one can conclude that defendant "consciously disregarded" these instructions, the following questions need to be asked and answered: (1) Was defendant in fact told that death or great bodily harm might result if any of these instructions were not followed? (2) Did defendant understand these instructions and remember them on the date in question? And (3) What does the record show about defendant's cognitive ability to understand and apply instructions regarding the treatment of her baby? Frankly, not much.

¶ 89            Defendant gave a statement to the police, which the State offered into evidence and was admitted, in which she stated that people let their babies sleep in car seats all the time. In that interview, she also stated the following:

"Because *** there are so many rules about babies. You can't put them this way. You can't put them that way. And I didn't know, I've seen people do it [put babies

- 28 -

in car seats] before, but I didn't know if there was like something that *** told [us] you can't do that. I didn't know."

¶ 90       The testimony of the defense expert, Dr. Nichols, is also troubling when one tries to assess what this defendant knew about safely caring for her child. After all, Dr. Nichols dismissed the idea that covering a baby in a car seat with a blanket could have caused the child's injuries, noting that in forming his opinions, he "reviewed the literature and could find nothing in the medical literature and nothing in the consumer protective literature to indicate that this was an unsafe practice." *Supra.* ¶ 29.

¶ 91       Indeed, referring to his own experience as a father, he testified that he was confident that his own children at some point must have been asleep with a blanket over them in the car seat, "and they did just fine."

¶ 92       It is difficult to reconcile Dr. Nichols's testimony with the State's theory that this defendant, about whose education and background we know very little, was actually aware that her conduct in placing the child overnight to sleep in a car seat while in a snowsuit with a blanket over her might result in death due to suffocation. And, frankly, I wonder just how many parents in the general population would have any such awareness. Even DCFS investigator Molly Evans, who testified as a State's witness, said it was true that parents frequently let their babies sleep in car seats, although not with blankets and snowsuits.

¶ 93       And like Dr. Nichols, defendant's medical expert, as a parent I have placed my children in car seats for extended periods of time when I was driving for hours with them in the car. I certainly was not aware that my doing so placed the child in danger of suffocating if the child were to slip down in the car seat and I didn't notice. In fact, to what extent (again, assuming this is a contributing factor in the cause of death) is this a danger well known to the public? And

if it is not well known, shouldn't that be a factor in evaluating whether this defendant "consciously disregarded" a dangerous situation?

¶ 94    Last, I note that in finding defendant guilty of involuntary manslaughter, the trial court stated that defendant was aware that the manner in which she left Leah on the date in question was "just plain wrong and was in fact dangerous." The court noted this was shown by the parental education that defendant had received from hospital staff regarding safe sleeping positions for a baby and by the fact that, after Leah sustained her injuries, defendant lied to the police and DCFS about what happened. The court further concluded that defendant "consciously disregarded a substantial and unjustifiable risk that the baby could suffocate."

¶ 95    However, as defendant argues, I believe the trial court gave far more weight to defendant's lying to the police than it deserved. I agree with defendant's assessment, as follows:

> "[Defendant] acknowledges that her act of falsely telling police that she put Leah to sleep on her back may reflect a consciousness that she had done something wrong. However, it does not indicate that she consciously disregarded a substantial risk or that her deviation from a reasonable person's standard of care was gross. Rather, it indicates no more than a painful after-the-fact realization that she had been careless or negligent, with terrible consequences. [Defendant] was a 19-year-old first-time mother, who was dealing with police as well as a desperately ill child. Her false statements establish no more than that she was ashamed of her carelessness or negligence and sought to conceal it, and that she was worried about the legal consequences to herself and Crafton for any admission of carelessness or negligence."

¶ 96    For all of these reasons, I respectfully dissent.