2021 IL App (2d) 190181-U
No. 2-19-0181
Order filed June 10, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of De Kalb County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-314 |
| TANYA A. BROWN, | ) ) | Honorable William P. Brady, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Presiding Justice Bridges and Justice Birkett concurred in the judgment.

**ORDER**

¶ 1     *Held*: The State proved beyond a reasonable doubt that defendant committed reckless conduct when, in using bicycle kicks with her infant daughter to relieve constipation, she departed from the pediatrician's instructions and used a technique that she knew created a substantial risk of injury and that did, in fact, fracture the infant's femur. Also, there was no error, and thus no plain error, when the State elicited testimony that a DCFS investigator was present for police interviews with defendant. The evidence was relevant for showing the context of the interview, and there was no undue prejudice since it was already apparent from the nature of the criminal charges that the case involved alleged child abuse.

¶ 2     Defendant, Tanya A. Brown, appeals from her conviction of reckless conduct (720 ILCS 5/12-5(a)(1) (West 2016)). She contends: (1) she was not proven guilty beyond a reasonable doubt

in that the State failed to establish that, objectively, she was anything more than negligent or that, subjectively, she consciously risked breaking her baby's femur, and (2) the State's introduction of evidence that the Department of Children and Family Services (DCFS) was involved in her case was plain error. We conclude: (1) the evidence was sufficient, and (2) the evidence of DCFS's involvement was not error and, thus, not plain error. We therefore affirm.

¶ 3                                I. BACKGROUND

¶ 4      Defendant was charged with several counts alleging that she caused fractures to the femur of her daughter, M.M., who was two months old at the time. Defendant was charged with one count each of reckless conduct (720 ILCS 5/12-5(a)(1) (West 2016)) and aggravated battery of a child (720 ILCS 5/12-3.05(b)(2) (West 2016)) and two counts of domestic battery (720 ILCS 5/12-3.2(a)(1), (a)(2) (West 2016)).

¶ 5      At a pretrial conference, the State, in discussing the witnesses it intended to call, noted that it would "probably not [be] calling DCFS." Defense counsel commented that the State's decision not to call a DCFS witness mooted a concern that would have been the basis of a defense motion.

¶ 6      On the day of trial, defense counsel commented that he had intended to ask the court to bar the testimony of DCFS investigator Jessica Bateman "at least until [the State's] rebuttal." However, counsel noted that the State's assurance that it was not calling Bateman "eliminated the problem." Defense counsel opined that the State should not be allowed to introduce information about "DCFS employees and indicated reports and State investigations" in the State's case-in-chief. The State said that it had never intended to introduce information from DCFS reports but had only considered calling Bateman as a witness to defendant's statements.

¶ 7      During jury selection, the State questioned potential jurors about whether they had any contacts with DCFS; when a juror acknowledged contact with DCFS, the State's follow-up

questioning was detailed. The defense did not object to this line of questioning. In one instance, it followed up on the State's questions about DCFS contact.

¶ 8    At trial, Detective Sonny Streit of the De Kalb Police Department testified about his investigation of M.M.'s injuries. Streit was dispatched to the Kishwaukee hospital on December 15, 2017. When he arrived, he "spoke with hospital staff first and then *** went to the emergency room where [M.M., M.M.'s father,] and Jessica Bateman from DCFS were."

¶ 9    After this exchange, the court asked the State whether Streit knew that he was "not supposed get into the DCFS stuff." The State said that Streit was aware.

¶ 10    Resuming his testimony, Streit said that, at the hospital, he asked defendant what she thought had happened to M.M.'s leg. Also present for Streit's conversation with defendant was M.M.'s father and Bateman. Defendant told Streit that she thought that her five-year-old son had rolled over onto M.M. while they were sleeping.

¶ 11    Before defendant left the emergency room, Streit interviewed defendant a second time with Bateman again present. Defendant mentioned that she had ongoing concerns about M.M.'s constipation. She was uncomfortable with some of the pediatrician's suggestions for relieving constipation, including "tummy time," which she did not think was safe. However, she did use another suggested technique, bicycle kicks. She had used suppositories, but after her pediatrician told her that they were not recommended, she went back to bicycle kicks.

¶ 12    Streit told defendant that he knew from his investigation that the injuries were not the result of her son rolling over onto M.M.'s leg. He asked her if she could have "pressed too hard" when doing the bicycle kicks. She said that she might have but that she was not sure. Streit testified:

> "She said that that night she was upset about her child not being able to have a bowel
> movement. It's been approximately two days *** since the child's last bowel movement.

She said that she wanted to take the child's pain away and she's been constipated in the past before, so as [M.M.] was crying she couldn't stop her crying. [Defendant] began to cry as well so as she's doing the bicycle kicks and trying to stop [M.M.] from crying she's crying and she just wanted to help her have a bowel movement."

¶ 13    About an hour after defendant left the emergency room, Streit went to her home to further interview her. The State asked Streit who else was present at the interview, and he responded, "It was [defendant], her son, [M.M.], there was another friend there at the time, and then Mrs. Bateman." The State then asked whether Streit and Bateman had discussed bicycle kicks with defendant during that interview. Streit said that defendant was asked to demonstrate with a doll how she had performed bicycle kicks on M.M. Streit continued:

"A. *** Her little finger and her ring finger were on the doll's thighs. Her *** middle finger and her index were on the calves of the doll. The thumb was wrapped around the thighs as she pushed the knees of the doll to the chest of the doll and she did that multiple times on the bed.

***

[Q.] For the record the witness was holding his hands out as if he was holding legs and moving in unison.

* * *

[A.] *** [She was h]olding the thighs like that, thumb wrapped around, fingers on the calves and slowly pushing the legs to the chest.

* * *

Q. Detective, when you observed the defendant moving the doll's legs, was it done in anything that you would describe as an alternating fashion or was it done in a together unison fashion?

A. Together at the same time.

Q. How would you describe the amount of force the defendant exhibited when she moved the doll's legs?

A. When she was moving the legs it was smooth, normal amount of force with the doll at the time.

Q. Did you have any conversation with her regarding how much force she used on [M.M.'s] legs?

A. Yes. I asked her if she did [it] harder that night. She climbed up onto the bed as if she was the infant. She laid on her back. She grabbed onto the bedding and she explained that [M.M.] was gripping onto the bed. The two month old was pushing back towards her as she's moving her legs. As she pushes back *** [defendant] says she was advised to push hard as [M.M.] pushes hard back to her, so she said that she was pushing hard trying to relieve the pain from her daughter."

Defendant confirmed to Streit that it was immediately after the bicycle kicks that M.M., who was continuing to cry, held one leg up closer to her body. That was why defendant took M.M. to the hospital.

¶ 14 On cross-examination, Streit confirmed that defendant had been cooperative with the investigation. For instance, she signed a medical release for M.M.'s records. In addition, he agreed that defendant had expressed that she was upset by M.M.'s discomfort but had not suggested that she felt frustration or anger toward M.M.

¶ 15    Dr. Laura Marie Lemke, a pediatric orthopedic surgeon, testified for the State as an expert witness and as one of M.M.'s treating physicians. Dr. Lemke examined M.M. on three occasions, beginning on December 20, 2017. M.M. had been referred based on her emergency room visits on December 14 and 15, 2017, and a radiologist's report noting two fractures to her femur. Dr. Lemke explained that an infant's bones are relatively flexible and that it takes "significant trauma" to cause an infant's bones to fracture rather than bend.

¶ 16    Along the shaft of the femur was a newer fracture that was already healing. The older fracture was a "corner fracture" to the outside of the lower end of the femur. Femoral shaft fractures usually result from twisting or pulling, such as by a child getting a leg caught in something and pulling. However, a nine-week-old infant would not have sufficient strength to cause a femoral fracture this way, so fractures of either kind noted in the X-ray are usually the result of someone pulling on the infant.

¶ 17    When asked if a five-year-old child could cause a femoral shaft fracture in an infant by lying on top of the infant's leg, Dr. Lemke answered, "It would require a more abrupt force to break the leg." However, she agreed that a "bigger child" could cause the fracture by lying on the leg, "[i]f there was pressure." She further noted that performing bicycle kicks on an infant could cause the fracture if excessive force were used.

¶ 18    Dr. Lemke further testified that the fracture near the end of the femur could be the result of strong shaking. It could also be the result of bicycle kicks executed too vigorously. This fracture type could also occur if a larger child rolled on top of the infant's leg.

¶ 19    Dr. Lemke also opined that the fracture to the femur's shaft likely occurred two weeks before the X-ray was taken on December 14, 2017. Healing bone would not show up on an X-ray any sooner than that. The fracture at the lower end of the femur appeared to be new.

¶ 20    On cross-examination, Dr. Lemke again affirmed that some action by an older child could have caused either fracture. She agreed that the injury could have resulted from M.M.'s leg getting stuck in her crib, but she said that this was an unlikely explanation given M.M.'s age. In her three examinations of M.M. on different dates, Dr. Lemke never observed any visible signs of injury, such as bruises or abrasions. M.M.'s behavior was appropriate for a two-month-old and her interactions with defendant were appropriate. By the time of the first visit on December 20, 2017, M.M. had no symptoms from either fracture identified by the radiologist.

¶ 21    Dr. Mayuri Morker testified as M.M.'s pediatrician. M.M. was born prematurely at 36 weeks gestation and weighed four pounds eight ounces. Dr. Morker first saw M.M. on October 15, 2017, when M.M. was four days old. M.M. had further routine appointments on October 23, 2017, and November 2, 2017. At these appointments, defendant shared concerns about constipation. Morker counseled her on normal bowel movement frequency in infants and practices that could relieve constipation. One of those practices was the use of bicycle kicks, which, according to her notes, she explained to defendant at the November 2, 2017, appointment. According to her testimony, the maneuver is performed as follows:

> "[B]icycling of the leg is kind of replicating the motions of if you were seated on a bicycle and riding your bicycle[,] so one leg up and down. We have them *** gently hold the legs and one at a time go up and down to kind of help the tummy feel a little bit of that pressure to hopefully increase movement in the intestines."

¶ 22    Defendant appeared to understand the procedure. At a November 30, 2017, visit, M.M. was noted to be in the first percentile for weight but gaining weight normally. Defendant again indicated concern about constipation, reporting that M.M. appeared to be straining. Dr. Morker

counseled defendant to avoid suppository use—defendant reported using them on M.M. up to three times a day. She further counseled increased tummy time and reviewed the use of bicycle kicks.

¶ 23    M.M.'s next appointment, on December 18, 2017, was listed as one to address the fracture. Dr. Morker's records show that defendant, in speaking with staff, " 'denie[d] any trauma or unusual activity which may cause fracture.' " However, at that visit, defendant's primary concern was again constipation. Based on what defendant told her, Dr. Morker believed that M.M. was not in fact constipated.

¶ 24    Dr. Morker knew of no other infant patient of hers suffering fractured femurs from bicycle kicks, and the risk of a fracture was not something that she would mention to parents when discussing the maneuver; injuries to the femurs of infants are rare. Moreover, when she observed M.M. as a patient, she never noticed any bruises or abrasions.

¶ 25    The defense rested without presenting evidence.

¶ 26    The jury was instructed, among other things, that "[a] person is reckless when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in this situation." The jury acquitted defendant of all charges except the charge of misdemeanor reckless conduct (during deliberations, the jury had requested a definition of "knowingly," but that pertained to one of the offenses of which she was acquitted).

¶ 27    Defendant filed a posttrial motion in which she argued that the State had failed to present sufficient evidence of recklessness to sustain her conviction. She contended, among other things, that the State never showed that defendant had not attempted to follow Dr. Morker's instructions on bicycle kicks, even if her performance of the kicks was different than what Dr. Morker had demonstrated. Defendant argued that a failed attempt at following medical instructions is

insufficient to demonstrate the *mens rea* necessary for reckless conduct. At a hearing on her motion, the State argued, in essence, that the fracture spoke for itself.

¶ 28    The court questioned the State at length about how a failure to follow instructions would translate into recklessness. The State pointed to defendant's emotional upset at the time of the injury and her misleading of hospital staff about the injury's cause. In addition, it argued that defendant had described herself as pressing M.M.'s legs harder and harder into her chest. At the end of the hearing, the court said that it needed time to review the testimony.

¶ 29    The court denied defendant's motion, finding that the question of recklessness was one for the jury:

> "[S]o you have somebody who doesn't show an intent to harm the child but, of course, that's what the jury found, there was not sufficient evidence of showing any intent to harm the child.
>
> And you could say, well, this was just a compromise verdict. They just agreed to the reckless conduct because one person may have held out for the intentional stuff. We don't know that so we have to look back at the evidence and expect the jury followed its instructions and listened to the evidence and made the determination. Is there evidence to support the argument that absent something unusual this should not have happened? Yeah, I think there is evidence that not for me to judge that evidence in the sense that I wasn't the trier of fact. *** Whether I would agree with that evidence or not is not the standard that I have to follow in this particular case.
>
> *** I can't say there was no evidence on whether or not the conduct that caused the injury—first off, that the conduct she followed or used caused the injury. There was *** also evidence that absent unusual circumstances that those types of injuries or at least

one of the injuries would have [*sic*] occurred, and at this stage I think I have to let the jury make that call.  They did.  \*\*\*  They obviously were concerned about the issue because they came back with not guilties on the intentional offenses.  They thought about it.  \*\*\*

So I'll deny the motion for new trial."

¶ 30    The court, commenting that the conduct was not child abuse and was the kind of situation for which court supervision was intended, sentenced defendant to 18 months' supervision with specified conditions.  Defendant filed a timely notice of appeal.

¶ 31                                II. ANALYSIS

¶ 32    On appeal, defendant argues: (1) the evidence was insufficient to establish that, objectively, she was anything more than negligent or that, subjectively, she consciously risked breaking her baby's femur, and (2) it was plain error for the State to repeatedly elicit evidence of the presence of DCFS investigator Bateman during Streit's interviews with defendant.

¶ 33                          A. Sufficiency of the Evidence

¶ 34    Under the Illinois Criminal Code of 2012 (Code), a person commits misdemeanor reckless conduct when "he or she, by any means lawful or unlawful, recklessly performs an act or acts" and that act or those acts "cause bodily harm to or endanger the safety of another person."  720 ILCS 5/12-5(a)(1).  The Code defines recklessness as follows:

"A person is reckless or acts recklessly when that person [(1)] consciously disregards [(2)] a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense, and [(3)] that disregard constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation."  720 ILCS 5/4-6 (West 2016).

¶ 35    Defendant argues, as we detail below, that the State failed to prove any of the three elements of recklessness.  The State responds as follows:

> "Newborns are understandably fragile.  Dr. Morker informed defendant, with demonstration, how to *gently* perform bicycle kicks to alleviate constipation.  In her attempts to alleviate M.M.'s constipation, defendant used force on M.M.'s legs, which immediately caused M.M. to hold her leg in pain.  Defendant demonstrated her lack of recollection to Det. Streit by failing to gently bicycle kick M.M.'s legs by moving the legs in unison.  Defendant was informed to use gentle force on her newborn.  She recklessly disregarded this information on more than one occasions [*sic*] resulting in two separate fractures to M.M.'s right femur.  These are not the actions of a reasonable person.  *See* 720 ILCS 5/4-6 (West 2016). Defendant's actions were more than mere negligence, she disregarded the substantial risk of bodily harm, which resulted in M.M.'s fractured femur."  (Emphasis in original.)

The State does not specifically address any of defendant's arguments on the sufficiency of the evidence.

¶ 36    We review the sufficiency of the evidence under the standard of *Jackson v. Virginia*, 443 U.S. 307 (1979), as adopted by *People v. Collins*, 106 Ill. 2d 237 (1985).  When a reviewing court decides a challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the State, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' "  (Emphasis in original.) *Collins*, 106 Ill. 2d at 261 (quoting *Jackson*, 443 U.S. at 319).  "Under this standard, a reviewing court must allow all reasonable inferences from the record in favor of the prosecution." *People v. Davison*, 233 Ill. 2d 30, 43 (2009).

"Under [the standard of *Jackson* and *Collins*], the reviewing court does not retry the defendant, and the trier of fact remains responsible for making determinations regarding the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence. [Citation.] But merely because the trier of fact accepted certain testimony or made certain inferences based on the evidence does not guarantee the reasonableness of its decision. A conviction will be reversed where the evidence is so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of [the] defendant's guilt." *People v. Ross*, 229 Ill. 2d 255, 272 (2008).

¶ 37   As defendant points out, this standard requires us to reject *unreasonable* inferences. But the State is not required to present evidence that excludes every reasonable hypothesis of the defendant's innocence. *E.g.*, *People v. Larson*, 379 Ill. App. 3d 642, 654 (2008).

¶ 38        1. *Whether, Objectively, Defendant's Conduct was More than Negligent*

¶ 39   Defendant first argues that, because the State failed to show that she disregarded a well-known risk, the State did not demonstrate that, objectively, her conduct was more than negligent. In other words, she contends that it did not present adequate evidence that there was "a substantial and unjustifiable risk that circumstances exist[ed] or that a result [would] follow, described by the statute defining the offense," and that defendant's disregard of that risk "constitute[ed] a gross deviation from the standard of care that a reasonable person would exercise in the situation." 720 ILCS 5/4-6 (West 2016). She argues that "[i]t is not well-known that bringing a baby's knees to its chest, even hard, risks breaking a femur" and that, therefore, this case is unlike ones involving, *e.g.*, unsafe gun use or foolhardy driving. We find this argument unpersuasive. The evidence was sufficient for a jury to conclude that defendant acted in a way that an ordinary person would

recognize as creating an unjustifiable risk of injury and that her actions grossly deviated from the care a reasonable person would exercise in the circumstance.

¶ 40    Before we can address the objective reasonableness of defendant's actions, we first must address what a reasonable jury could have concluded defendant's actions actually were. We deem that the jury could reasonably conclude that defendant manipulated M.M.'s legs in a way that deviated from the medical recommendation and that, in doing so, she applied grossly excessive force to M.M.'s legs.

¶ 41    Defendant does not contest that she caused at least one of the fractures by manipulating M.M.'s legs. But the evidence is sufficient for the jury to have properly inferred more than that. Dr. Lemke testified that bicycle kicks, performed with excessive force, could cause both types of fractures observed in M.M.'s X-ray. Given that defendant noticed that M.M. was showing signs of pain immediately after defendant manipulated her legs, a reasonable jury could conclude that defendant indeed used excessive force and that that force was the source of at least one of the fractures. Dr. Morker testified to teaching defendant to move M.M.'s legs in a gentle cycling movement. The jury could reasonably infer that defendant should have done this movement by holding the feet or lower legs of the infant. But, according to Streit, defendant used a doll to demonstrate a very different grip, one in which her thumbs and her little and ring fingers circled the thighs while her index fingers extended to the doll's calves. The jury could have inferred that this grip would have tended to increase the force defendant applied to M.M.'s leg and make it difficult for defendant *to control* the amount of force she was using.

¶ 42    The jury could reasonably conclude that (1) the modified bicycling technique used by defendant created what an ordinary person would recognize as an unjustifiable risk of injury, and (2) defendant's actions were a gross deviation from the care a reasonable person would exercise

under the circumstances. As the State correctly notes, ordinary people understand that infants are fragile. This is particularly so of very small infants like M.M., who, although growing properly, are still in the lowest percentile for weight. An ordinary person may not possess Dr. Lemke's specialized understanding of the particular vulnerabilities of infants, and thus may be unaware of specific injuries to which they are most susceptible. Nevertheless, an ordinary person will recognize that rough handling of an infant's legs will create what will be—absent emergency—an unreasonable risk of injury. Moreover, no objective reason existed for (1) taking a grip on M.M.'s legs in a manner that encourages greater force than the recommended grip or (2) performing the kicks with great force. In that light, the jury could reasonably infer that defendant's actions represented a gross deviation from the standard of care that a reasonable person would exercise in the situation.

¶ 43 In so holding, we distinguish *People v. Gibbs*, 119 Ill. App. 2d 222 (1970). In *Gibbs*, the assertedly reckless conduct was failing to adequately supervise and protect a 14-month-old child who died after falling down a flight of basement stairs. *Gibbs*, 119 Ill. App. 2d at 224, 227. According to the *Gibbs* court:

"The only evidence [relevant to the defendant's recklessness] is uncontroverted[: the] defendant admitted in her testimony that she knew of the child's proclivity for tripping and falling; that on one occasion, while descending the stairs in her company, the child had pulled away and fallen down part of the stairway; that she left the child out of the playpen, unattended, and that she neglected to close the door leading to the stairway." *Gibbs*, 119 Ill. App. 2d at 228.

The *Gibbs* court reversed the defendant's reckless conduct conviction, stating that to hold that such conduct was reckless would "mean that if any person were to leave a child in a room, briefly

- 14 -

unattended, and omitted to close a basement door, whether the child was injured or not, such individual would be guilty, not of negligence, but of the offense of reckless conduct." *Gibbs*, 119 Ill. App. 2d at 231. It deemed that the legislature could not have intended that result. *Gibbs*, 119 Ill. App. 2d at 231. The lesson we draw from *Gibbs* is that some kinds of negligence are, in a sense, ordinary: they arise, for instance, out of competing demands on attention. Because they are hard to avoid, they are not deemed gross deviations from the standard of care. Further, because they are not gross deviations, they cannot support a reckless-conduct conviction. Here, however, defendant's choice to modify the performance of bicycle kicks was inherently more deliberate than the kind of negligence at issue in *Gibbs*; it was thus not ordinary in the same way as insufficient watchfulness may be. A jury could find that defendant's decision was a gross deviation from the standard of care.

¶ 44     Defendant argues that, because injuries to infants' femurs are rare, it follows that it is not widely known that actions such as hers pose a risk of causing this sort of injury. We do not accept this logic. An injury can be rare precisely because people generally know better than to do the things that will cause it. As that applies here, people know better than to use great force on a small infant. To be sure, a layperson may not be able to predict the exact type of injury that forceful manipulation of an infant's legs is most likely to cause. Still, the existence of a risk of some type of injury is obvious.

¶ 45     Defendant argues that Dr. Morker's advice to perform the kicks would have made it reasonable that defendant would not be concerned that the maneuver would cause injury. But, as we have just held, a reasonable jury could conclude that defendant performed the kicks in an objectively unreasonable manner.

¶ 46     2. *Whether, Subjectively, Defendant Consciously Risked Breaking Her Baby's Femur*

¶ 47    Defendant next argues that the State failed to provide sufficient evidence that she "subjectively, consciously risked breaking her baby's femur."  She contends that, because the evidence showed, and the State conceded, that she loved M.M. and was trying to relieve M.M.'s pain, it would be unreasonable to infer that defendant "consciously risked breaking her baby's bone."  She argues that, "because she forgot what her pediatrician had demonstrated, and because forgetfulness cannot be conscious risk awareness, the State's suggested inferences [of conscious disregard of a risk] were unreasonable."

¶ 48    Defendant's argument is flawed in that (1) the evidence does not require an inference that defendant forgot Dr. Morker's instructions, and (2) even if the jury concluded that defendant was acting to relieve M.M.'s discomfort, that conclusion would not preclude it from properly deciding that she consciously disregarded a substantial and unjustifiable risk.  A reasonable jury could infer that defendant consciously placed concern for relieving M.M.'s pain or constipation over more basic concerns for her safety.

¶ 49    First, nothing in the evidence suggests that defendant *forgot* the directions Dr. Morker gave her for performing bicycle kicks.  The evidence would allow the jury to infer that defendant deliberately modified the directions.  First, according to Streit's account of defendant's statements, M.M. tensed up when defendant tried to move her legs.  Thus, the jury could infer that defendant tried to find a way to perform the movements despite M.M's resistance, and therefore did not perform the recommended gentle cycling movement.  Second, Streit's testimony indicated that defendant knew that the maneuver she was attempting was called a "bicycle kick."  The jury could infer that, if defendant remembered that descriptive name, she would have remembered that it called for the legs to move in alternation with the knees bending. Instead, per Streit's account of her statement, defendant grasped M.M. around the thighs—which would be inconsistent with

M.M.'s knees bending in bicycle fashion—and she moved M.M's legs together, not in alternation. From those differences, a reasonable jury could infer that defendant *deliberately* deviated from Dr. Morker's instructions.

¶ 50    Second, a desire on defendant's part to relieve M.M.'s discomfort would not be inconsistent with her conduct being reckless.  Instead, that desire could have allowed her to override her better judgment concerning what was safe.  To be sure, giving excessive importance to the relief of another's pain over general safety might be a lesser form of wrongdoing—more a typical disregard of safety—but that does not prevent it from being a gross deviation from the standard of care.

¶ 51    We further conclude that a reasonable jury could infer that defendant in fact consciously disregarded the risk of harm.  As stated, the evidence would allow the jury to infer that defendant used a technique that differed from, and was riskier than, what Dr. Morker taught her.  We agree with defendant that, had Dr. Morker specifically warned defendant against excessive force or against the modifications that Strait said that defendant made to the technique, the evidence of conscious disregard would have been stronger.  See *People v. Buckley*, 282 Ill. App. 3d 81, 89 (1996) (proof that the defendant received a warning about the lethal potential of Dimetapp "could establish that [she] possessed knowledge of the likelihood of death or great bodily harm from an overdose").  However, as we previously indicated, a person does not need an expert warning that it is dangerous to handle small infants roughly.

¶ 52    Furthermore, according to Streit's account of her statement to him, defendant was so distressed by M.M.'s evident discomfort that defendant herself was crying.  That evidence would allow the jury to infer that defendant was in a mental state such that she could consciously set aside obvious safety concerns to try to relieve M.M.'s discomfort.  Defendant's argument, taken at face

value, would require the conclusion that a parent who gives an infant an adult medication, such as a pain killer, out of the desire to relieve discomfort cannot, due to his or her motivations, be acting recklessly. That implication is absurd on its face. Thus, we conclude that the State presented evidence sufficient for the jury to reasonably infer the existence of the subjective element of recklessness.

¶ 53    We accept that there is a general presumption that people do not consciously risk harm to themselves or their loved ones (see 2 Wayne R. LaFave, Substantive Criminal Law, § 5.4(d) (3d ed. 2017), but that presumption was overcome here. Here, as noted, a jury could reasonably find that the risk of injuring the child was an obvious one and that defendant disregarded it consciously.

¶ 54                    B. Whether the State's Eliciting of Testimony
                    Indicating DCFS Involvement Was Plain Error

¶ 55    Defendant contends that the State caused plain error by eliciting irrelevant testimony from Streit that mentioned the presence of Bateman, a DCFS child-abuse investigator, during his interviews with defendant. She contends that the State violated the "spirit" of its "promise" not to call Bateman by allowing Streit to mention Bateman five times during his testimony. She claims that this evidence was both irrelevant and prejudicial. She concedes, however, that she failed to preserve the issue of the comments about Bateman's presence by failing to raise them in a trial objection and in a posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 185-86 (1988) (stating the general rule for preserving error). She thus asks us to review her claim under the plain-error doctrine.

¶ 56    The State responds, first, that defendant forfeited her plain-error argument by failing to support it with pertinent authority. Illinois Supreme Court Rule 341(h)(7) (eff. May 25, 2018), provides that the argument section of the appellant's brief must contain "[a]rgument, which shall

contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on."

¶ 57 The State points out that, on at least one occasion, we have summarized this requirement as providing, "Arguments unaccompanied by a citation of *pertinent* authority are forfeited." (Emphasis added.) *People v. Conway*, 2019 IL App (2d) 170196, ¶ 11 (citing *Watson v. West Suburban Medical Center*, 2018 IL App (1st) 162707, ¶ 214 (citing Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2017))). The State contends that we have thus held that an argument not supported by authority that is reasonably on point is forfeited. We do not read *Conway* to create a forfeiture rule stricter than that in Rule 341(h)(7). Moreover, defendant has complied with the rule as properly construed. She cites case law and an Illinois Supreme Court rule for principles on the admissibility of evidence. She also cites what she claims is factually analogous case law recognizing the inflammatory potential of evidence that insinuates possible child abuse. As we note below, these cases are not closely on point, yet they nonetheless satisfy Rule 341(h)(7). Accordingly, we hold that defendant has not forfeited her plain-error argument, and we move to the merits of that argument.

¶ 58                     1. *Defendant's Claim of Plain Error*

¶ 59 The plain-error doctrine provides a narrow exception to the requirement that claims of error must be properly preserved. *People v. Szabo*, 113 Ill. 2d 83, 94 (1986). It allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error (first-prong plain error), or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and

challenged the integrity of the judicial process, regardless of the closeness of the evidence (second-prong plain error). *People v. Piatkowski*, 225 Ill. 2d 551, 564-65 (2007).

¶ 60    To find plain error, we first must find reversible error. See *People v. Naylor*, 229 Ill. 2d 584, 602 (2008) ("Absent reversible error, there can be no plain error."). Moreover, that reversible error must be clear or obvious. See *People v. Burton*, 2012 IL App (2d) 110769, ¶ 15 (we must determine whether the error is such that it would require reversal of the defendant's convictions before we reach the issue of whether the evidence was closely balanced). Only upon finding clear or obvious reversible error do we apply the two-prong plain-error analysis. See *Burton*, 2012 IL App (2d) 110769, ¶ 15.

¶ 61    Defendant contends that the evidence that Bateman was present when defendant was interviewed was irrelevant and thus inadmissible. We disagree. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). Irrelevant evidence is inadmissible. Ill. R. Evid. 402 (eff. Jan. 1, 2011). Alternatively, defendant contends that the marginal probative value of the evidence was greatly outweighed by the undue prejudice the admission of the evidence necessarily caused, such that the evidence was inadmissible under Illinois Rule of Evidence 403 (eff. Jan. 1, 2011) (relevant evidence "may be excluded" when "its probative value is substantially outweighed by the danger of unfair prejudice"). Where an issue of the relevance and admissibility of evidence is preserved, we review it for an abuse of discretion. See, *e.g.*, *People v. Tapley*, 2020 IL App (2d) 190137, ¶ 88.

¶ 62    On the question of relevance, the State aptly notes that Streit's testimony as to Bateman's presence for the interviews served to provide an accurate account of who witnessed defendant's statements. Such context is routinely supplied in testimony about police interviews. Bateman's

presence was no less material than that of any other third party, such as M.M's father, and defendant did not object to testimony about his presence.

¶ 63    We further hold that it was not error under Rule 403 for the State to present evidence of Bateman's status as a DCFS investigator and her presence during the interviews.  Although the evidence was not in any way central to the State's case, the prejudice was minimal because the evidence did not reveal anything that the jury would not have independently deduced.  First, as the State notes, the potential jurors were asked about their attitudes toward DCFS, thus priming them to anticipate that the case involved a DCFS investigation of child abuse.  Defendant did not object to these inquiries.  Second, a juror having ordinary familiarity with government functions will understand that, if a hospital notifies the police about an injury to a child, DCFS will likely become involved because of possible child abuse.  Further, regardless of what the jury would have inferred about DCFS involvement, they were informed at the outset of *voir dire* that each of the criminal charges in the case involved harm to a "minor" or a "child."  Thus, the information that DCFS was involved did not introduce an implication of child abuse where none existed before.  Because Streit's challenged testimony could not have added to the jury's inevitable recognition that defendant was a child-abuse suspect, the risk of unfair prejudice from the evidence could not have substantially outweighed its probative value.

¶ 64    Defendant cites *United States v. Driver*, 945 F.2d 1410 (8th Cir. 1991) and *Aguinaga v. City of Chicago*, 243 Ill. App. 3d 552, 562-63 (1993) to suggest that the evidence of DCFS involvement was unduly prejudicial because it "portrayed her as a child-abuse suspect, at the least."  We need not consider the facts of either case to see that this is not a persuasive argument.  Again, the presence of a DCFS investigator was not needed to suggest that defendant was a child-

abuse suspect where the criminal charges involved harm to a child. As it happens, the facts of neither *Driver* nor *Aguinaga* are anything like those of this case.

¶ 65    In *Driver*, the defendant, who had raised a defense of self-defense, argued that he should have been permitted to introduce evidence that the person whom he shot was the subject of a child abuse investigation. *Driver*, 945 F.2d at 1416. The court of appeals rejected this argument in a few sentences, concluding: "The evidence of the child abuse investigation involving the victim would have served merely to portray him as a bad person, deserving to be shot, but did not relate to [the defendant's] claim of self-defense." *Driver*, 945 F.2d at 1416. Thus, the exclusion of the evidence was not an abuse of discretion. *Driver*, 945 F.2d at 1416. *Driver*'s holding is inapplicable here, where evidence of DCFS involvement added nothing to what the criminal charges of harm to a child already suggested.

¶ 66    *Aguinaga* is equally dissimilar. In *Aguinaga*, a minor, through his mother, sued the City of Chicago for damages resulting from an injury he claimed that he had incurred when he fell in a hole in a Chicago sidewalk. *Aguinaga*, 243 Ill. App. 3d at 554. The plaintiff argued that the trial court had erred by allowing an expert witness, Dr. Lelyveld, to testify for the City, rendering an opinion that it was unlikely that the minor's injury could have occurred in a way that was consistent with the minor's theory of the case. *Aguinaga*, 243 Ill. App. 3d at 561. In holding that the admission of Dr. Lelyveld's testimony was proper, the appellate court noted: "Dr. Lelyveld's testimony *** was properly limited to exclude any reference to child abuse [as a possible cause of the injury,] as that testimony's prejudicial effect would have outweighed its probative value." *Aguinaga*, 243 Ill. App. 3d at 564. *Aguinaga*, like *Driver*, suggests that an implication of child abuse may be unduly prejudicial where child abuse is not at issue. It does not guide on whether

such an implication can be unduly prejudicial when the defendant is charged with offenses that most jurors would naturally identify as child abuse.

¶ 67     Because Streit's references to DCFS involvement were not error, there was no plain error, and defendant's argument is forfeited.

¶ 68                                       III. CONCLUSION

¶ 69     For the reasons stated, we affirm the judgment of the circuit court of De Kalb County.

¶ 70     Affirmed.