NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 241533-U

NO. 4-24-1533

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 25, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Sangamon County |
| KAITLYNN R. RUSSELL, | ) | No. 22CF602 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Ryan M. Cadagin, |
| | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Presiding Justice Steigmann and Justice Zenoff concurred in the judgment.

**ORDER**

¶ 1   *Held*:   (1) The evidence is insufficient to sustain defendant's convictions for reckless conduct and child endangerment for defendant's alleged failure to obtain appropriate medical treatment, as there is no evidence from which a reasonable jury could find, beyond a reasonable doubt, this alleged failure was a cause or proximate cause of the child's death.

(2) The indictment complies with section 111-3(a)(3) of the Code of Criminal Procedure of 1963 (725 ILCS 5/111-3(a)(3) (West 2022)).

(3) The guilty verdicts on count I, child endangerment, and count III, reckless conduct, are legally inconsistent, as they are based on the same act and mutually exclusive mental states.

(4) As the remedy for ineffective assistance of counsel at trial is a new trial and a new trial is ordered due to the inconsistent verdicts reached on counts I and III, defendant's ineffective assistance claim is moot.

¶ 2     Defendant, Kaitlynn R. Russell, appeals her convictions of two counts of child

endangerment (720 ILCS 5/12C-5(a)(2) (West 2022)) and two counts of reckless conduct (*id.*

§ 12-5(a)(1), (2)). On appeal, defendant argues (1) the State failed to prove beyond a reasonable doubt she knowingly or recklessly failed to obtain medical treatment after finding Paris face down in water; (2) the trial court erred in not dismissing counts I and III, as the indictment set forth only a negligent act but charged defendant with reckless conduct and child endangerment; (3) the verdicts are legally inconsistent and require reversal and remand for a new trial, as the verdicts rely on mutually exclusive mental states for the same conduct; and (4) defendant was denied the effective assistance of counsel when trial counsel did not seek the exclusion of testimony after the State failed to produce a recording of a custodial interrogation. We agree with defendant's first and third arguments, reverse defendant's convictions, and remand for a new trial on counts I and III.

¶ 3                                    I. BACKGROUND

¶ 4                                    A. Indictment

¶ 5            On June 15, 2022, defendant was indicted on six offenses after the January 12, 2022, death of two-year-old Paris Green; only the first four counts went to trial. Count I alleged defendant committed endangering the life or health of a child "in that said defendant, knowingly caused or permitted [Paris], a child under the age of 18 years to be placed in circumstances that endangered [Paris's] life or health in that she failed to adequately supervise [Paris] and said circumstances were the proximate cause of [Paris's] death." See *id.* § 12C-5(a)(2). Count II alleged defendant committed the same offense in that she "knowingly caused or permitted [Paris] *** to be placed in circumstances that endangered [Paris's] life or health in that she failed to obtain immediate medical treatment for [Paris] after locating [Paris] face-down in a bath tub and said circumstances were the proximate cause of [Paris's] death." See *id.* Count III alleged defendant committed reckless conduct in that she "recklessly caused great bodily harm to [Paris],

[a] 2[-]year[-]old child, in that she failed to adequately supervise [Paris] thereby causing the death of [Paris] when the act was committed." See *id.* § 12-5(a)(2). Count IV alleged defendant committed reckless conduct by failing "to obtain appropriate medical treatment for [Paris] after locating [Paris] face-down in a bath tub thereby causing the death of [Paris]." See *id.* § 12-5(a)(1).

¶ 6                                    B. Motion to Dismiss Indictment

¶ 7        On August 2, 2024, defendant moved to dismiss the indictment, contending it failed to state a cause of action on all counts. Defendant argued, "[T]he law requires there to be an intentional act, and the State has alleged negligent or passive conduct in their charging document."

¶ 8        At the hearing on the motion, defendant argued the State did not charge in the indictment knowing or reckless conduct to satisfy the *mens rea* of the charged offenses. Instead, according to defendant, the State charged only an "omissive act," as negligence is not an intentional act. The State countered by arguing the indictment complied with the law and defendant's conduct "was a knowing act." The State concluded, "[T]here was action here and also willful inaction as well."

¶ 9        The trial court denied defendant's motion.

¶ 10                                    C. Trial

¶ 11        A jury trial was held in August 2024. At that trial, Keiona Smith, Paris's mother, testified defendant had watched her children in defendant's home for approximately one year before Paris's death. Between 7 and 8:30 p.m. on January 11, 2022, Smith dropped Paris and her younger sibling at defendant's home. At 4:55 a.m. on the following day, Smith received a call from defendant. She did not answer the call, nor did she pick up when defendant called again at

4:57 a.m. At 5 a.m., Smith answered defendant's third call. Defendant told Smith Paris "was breathing funny." Defendant explained she had bathed Paris in the sink after Paris soiled herself. Defendant said Paris "was making bubbles" but did not explain what she meant by "making bubbles." After Smith asked defendant to show her Paris on the video call, defendant "kind of hesitated" before bringing Paris to the phone. Smith observed Paris had a green shirt wrapped around her neck. Paris did not answer when Smith called her name. Smith told defendant to take Paris and meet her at the hospital. At the hospital, Smith asked defendant, " '[W]hat happened?' " Defendant replied, " 'I'm sorry, Sis, I tried. "

¶ 12    Medical staff testified to the events that occurred after defendant brought Paris to the hospital. Alana Downen, a registered nurse, testified, at approximately 5:15 a.m., she was called to the lobby by the triage area at the hospital. There she found a woman holding a child inside a coat. That woman asked Downen, " 'Can you check if they are okay?' " The child was "very cold." Downen took the child and had staff alerted "somebody critical [was] coming back." The child "was floppy, very, very cold, and was blue" and not breathing. Downen yelled for a pediatric crash cart and a bed. Staff began cardiopulmonary resuscitation (CPR) immediately. Warming efforts were made, including using warm fluids, a warming light, and warming blankets. After two hours of CPR, hospital staff could not register a core temperature, as their "thermometers don't go that low." The child was declared deceased.

¶ 13    Jessica Henley, a travel nurse, testified Paris arrived in wet clothing and was very cold. Paris's diaper, other than having feces, was dry. Henley spoke to the female who brought Paris in. Henley asked what happened and why Paris's clothes were wet. The female responded she placed Paris in the kitchen sink after Paris had diarrhea up her back. The female further explained she left the room to check on Paris's brother and returned to find Paris face down in

the sink.

¶ 14　　　　The treating emergency room physician, Robert Viaille, testified Paris's heart was not beating when she arrived at the hospital and stated, "[W]e began administering epinephrine, which is a component of resuscitation in order to try to get her heart to start back up." During the approximately 90 minutes of resuscitation efforts, there were no spontaneous respirations by Paris and no palpable pulse.

¶ 15　　　　The State presented the expert testimony of Nathaniel Patterson, a forensic pathologist, who conducted Paris's autopsy on January 12, 2022. Dr. Patterson concluded Paris's cause of death was drowning.

¶ 16　　　　Photographs and video evidence revealed the condition of defendant's residence. Defendant resided in a one-bedroom, one-bathroom apartment. A bookshelf with a television partially separated the kitchen from the living-room area. A white or beige sofa was in the living area. The door to the bedroom was off its hinges. Clothing, debris, and toys were scattered on the apartment floor. The bathtub contained three inches of milky-white standing water. Floating in the water were multiple dead cockroaches and a child's diaper.

¶ 17　　　　The State further introduced evidence of three police interactions with defendant. The first, part of a recorded police interview from January 12, 2022, occurred hours after Paris's death. In that interview, defendant stated Paris and her sibling were dropped off at her apartment at 2:30 a.m. Paris was asleep when she arrived but awoke approximately 5 to 10 minutes later and played for a short time. After Paris soiled her diaper around 4 a.m., defendant washed Paris her in the kitchen sink. Defendant left Paris in the sink, where she played with her toys for 5 to 10 minutes, while defendant watched television in the same room. Defendant could see Paris from the living room. Defendant took Paris from the bathtub and attempted to dress her. Paris's

shirt was only partly on, with one arm in a sleeve, because Paris was fighting defendant with the shirt. Paris lay on the couch. She then slid off the couch. Defendant noticed Paris was not breathing. She telephoned Smith. When asked if she was certain Paris was alive when at defendant's house, defendant said she was because defendant heard her make a "raspy noise" and, while on the phone with Smith, Paris's eyes were open and she nodded at her mother. Before heading to the hospital, defendant dressed Paris in a coat and shoes. At this time, Paris's eyes were closed, and she was not moving. Defendant could not wake her. When in the emergency room, defendant wiped Paris's nose because she had clear, "watery snot" running down her nose.

¶ 18        In this interview, during further questioning, defendant stated she and her boyfriend, Lawrence, were awake during this time. After getting out of the sink, Paris stood and watched television. Defendant observed "nothing unusual" until Paris slid from the couch onto the floor. Paris did not respond to defendant's attempts to wake her. At this time, defendant called Smith and rushed Paris to the hospital. Defendant reported, before being bathed in the sink, Paris was pushing a crate around the apartment. Paris used the crate to climb onto things. At one point, Paris fell from the crate to the floor onto her stomach as the crate slid from beneath her. Paris continued playing. Defendant stated she permitted Paris and her older sibling to run around the house, doing whatever they wanted, until they wore themselves out.

¶ 19        In revisiting the time period after Paris's bath in the sink, defendant reported Paris ate some Cheetos after the bath and walked around before falling asleep on the couch. Paris made a "raspy breathing noise." Defendant checked Paris's mouth and found nothing. Defendant then called Smith. Between attempts to get in touch with Smith, defendant was getting dressed to take Paris to the hospital, which was 5 to 10 minutes from defendant's apartment.

¶ 20　　　　The State's video of the second police interaction shows an interview beginning around 5:45 p.m. on the same day. Defendant reported Paris only went to the kitchen when at her apartment and did not go into other parts of the home. After a detective asked if Paris could have gotten her face into the water somehow, defendant mentioned Paris would grab cups from the kitchen counter and sometimes drink the bathwater. When asked if Paris could have drowned, defendant reported Paris would, at times, fall asleep while in the sink. Defendant stated she "did leave her in the sink maybe more than 15 minutes, and I probably wasn't—I was on my phone." Defendant could not tell if Paris went under, but she did have the faucet on and the water was cold. Upon hearing the water running, defendant removed Paris from the sink. Water overflowed onto the counter and the floor. At this time, Paris was standing and appeared fine. Paris ate some Cheetos. Defendant assumed Paris had fallen asleep. This occurred about 15 to 20 minutes after being taken from the sink.

¶ 21　　　　A detective asked about the condition of the bathroom and the standing water in the bathtub. Defendant acknowledged the water had been in the bathtub for a while. She noted the toilet would not flush with toilet paper. Defendant had been talking to her landlord about the conditions. When asked if it was possible Paris entered the bathroom and got into the bathtub, defendant acknowledged that was possible because she did play in the bathtub. After being informed police found objects in the bathtub that made it appear Paris had been in the bathtub and being asked if Paris had been in the bathtub, defendant said Paris fell into the bathtub. Defendant had heard a "boom" and rushed to pull Paris out immediately. Paris was lying face down, and the diaper "fell off." Paris "wasn't responsive." She was gurgling. Defendant stuck her finger in Paris's throat and tried to perform CPR for approximately five minutes. Water came out of Paris's nose. Defendant then called Smith and took Paris to the emergency room.

¶ 22    Defendant explained she and her boyfriend left water in the bathtub because of the roaches and the fact roaches were attracted to the water. Defendant forgot to drain the bathtub when the children arrived. Defendant drained the bathtub using a trash can. She said she usually kept the bathroom door closed. Defendant stated when Paris fell into the bathtub, both she and Lawrence were on their phones. Lawrence had on a headset while playing a game. The television was on.

¶ 23    Defendant's third conversation was described by Charles Redpath, a detective with the Springfield Police Department. Detective Redpath testified he and Detective Jennifer Howard were assigned to investigate Paris's death. Detective Redpath participated in the two videotaped interviews of defendant that occurred on January 12, 2022. After the interviews, the detective remained concerned about the length of time Paris was in the bathtub. On June 21, 2022, Detective Redpath asked defendant how much time passed between when she heard a thump and when she found Paris in the bathtub. Defendant stated the time was approximately one hour. Detective Redpath recorded the conversation on his department-issued cell phone. The department-issued cell phone would automatically erase the phone's data after more than five unsuccessful attempts were made to unlock the phone. In the days after the June 21, 2022, conversation, the detective had training with the SWAT team while in his "full kit." In that training, the phone was in Detective Redpath's pocket, and the contents were erased. Efforts were made to recover the recording, but those efforts failed.

¶ 24    The jury found defendant guilty on all counts. At sentencing, the trial court agreed with the State's assertion the reckless-conduct charges would merge into the child-endangerment charges under the one-act, one-crime doctrine. The court sentenced defendant to concurrent terms of 30 months' probation and 180 days' incarceration, with credit for the 652 days

defendant served while awaiting trial.

¶ 25　　　　This appeal followed.

¶ 26　　　　　　　　　　　　　　II. ANALYSIS

¶ 27　　　　　A. The Sufficiency of the State's Evidence on Counts II and IV

¶ 28　　　　As to counts II and IV, which charged defendant with child endangerment and reckless conduct based on defendant's alleged failure to seek immediate and appropriate medical treatment, defendant argues the State failed to prove those counts beyond a reasonable doubt. Defendant argues there is no evidence she acted knowingly or recklessly in her attempts to aid Paris and no evidence any alleged delay in seeking care caused harm. Defendant emphasizes no witness testified Paris's death would have been prevented had defendant sought medical attention sooner.

¶ 29　　　　The State disagrees and maintains the evidence, viewed in the light most favorable to the prosecution, sufficiently proves defendant acted knowingly and recklessly in not seeking medical help for Paris. The State highlights defendant's delay in getting Paris to the hospital upon finding her in the bathtub and then waiting in line in the emergency room. As to the issue of cause or proximate cause, the State asserts the jury could reasonably infer defendant's failure "proximately contributed to the victim's death."

¶ 30　　　　When reviewing a challenge to the sufficiency of the evidence, this court views the evidence in the light most favorable to the State and considers, in that light, whether any rational trier of fact could have found the State proved the essential elements beyond a reasonable doubt. *People v. Ivanchuk*, 2025 IL App (4th) 241230, ¶ 78.

¶ 31　　　　Both offenses, endangering the life or health of a child and reckless conduct, require proof defendant's alleged criminal act, failing to seek immediate or appropriate medical

attention, caused or proximately caused Paris's death. As charged against defendant in count II, endangering the life or health of a child requires proof defendant "knowingly *** *cause[d]* or permit[ed] the life or health of a child under the age of 18 to be endangered" and that action was "a *proximate cause* of the death of a child." (Emphases added.) 720 ILCS 5/12C-5(a), (d) (West 2022). Reckless conduct, as charged in count IV, requires proof defendant "recklessly perform[ed] an act or acts that *** *cause[d]* great bodily harm *** to another person." (Emphasis added.) *Id.* § 12-5(a)(2).

¶ 32        In general, "when a crime requires both an act by defendant and a specified result of that act, the defendant's act must be both the 'cause in fact' of the result and the 'proximate' or 'legal' cause of the result." *People v. Nere*, 2018 IL 122566, ¶ 31 (quoting 1 Wayne R. LaFave, Substantive Criminal Law § 6.4, at 628 (3d ed. 2018)). To satisfy the first requirement, the State must prove beyond a reasonable doubt defendant's act was a contributing cause of Paris's death. See *id.* ¶ 32. As to the second requirement, proximate cause, the State must prove beyond a reasonable doubt defendant's act of not seeking immediate medical care, " 'in natural or probable sequence, produced the injury complained of[;] *** [i]t is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury.' " *People v. Hudson*, 222 Ill. 2d 392, 401 (2006) (quoting Illinois Pattern Jury Instructions, Civil, No. 15.01 (2005)); see *People v. Cook*, 2011 IL App (4th) 090875, ¶ 30.

¶ 33        Here, given the evidence at trial, no rational trier of fact could have found the State proved the elements of "proximate cause" or "cause" beyond a reasonable doubt. Viewing the evidence in the light most favorable to the prosecution, there is no reasonable inference defendant's alleged delay in seeking medical treatment caused or proximately caused Paris's death. In response to defendant's argument on appeal, the State points to no medical testimony or

expert testimony Paris would have survived, or even probably would have survived, had defendant's efforts to secure medical treatment occurred quicker. In light of the absence of such testimony, the jury could only speculate as to the effect, if any, defendant's alleged delay had on Paris's death. To find the delay caused or proximately caused Paris's death based on the evidence at trial, any rational trier of fact would have to find, beyond a reasonable doubt, had Paris arrived at the hospital approximately 15 to 20 minutes earlier, she would have survived. There is no basis in the record to support that conclusion. The bulk of the evidence suggests the more likely conclusion, as the State argued in its closing argument, was Paris died in defendant's home. Defendant admitted approximately one hour passed after she heard a thump and found Paris in the bathtub, with her diaper floating in the water. When Smith asked defendant to show Paris to her during the video call, defendant hesitated to bring Paris to the phone, and Paris was not responsive to Smith. Upon arrival to the hospital, Paris was very cold, not breathing, and blue, and she had no pulse. At no point did Paris register a pulse. While it is *possible*, had defendant gotten Paris to the hospital earlier, she would not have died, given the absence of any medical testimony or expert testimony to support that conclusion and the weight of evidence showing Paris had already drowned when defendant found her sans diaper and face down in the bathtub, such a conclusion cannot reach the standard of being beyond a reasonable doubt.

¶ 34    Because the State did not prove all the elements of counts II and IV beyond a reasonable doubt, we reverse defendant's convictions on counts II and IV.

¶ 35                    B. The Sufficiency of the Indictment

¶ 36    Defendant argues her convictions on counts I and III must be reversed because the State, in its indictment, only alleged the failure to adequately supervise, which is an omission and not an act that can be knowingly or recklessly committed. Defendant argues, in effect, an

omission amounts only to negligence. As the State did not charge defendant with a knowing or reckless act, defendant argues, the indictment does not comply with the requirement of section 111-3(a)(3) of the Code of Criminal Procedure of 1963 (725 ILCS 5/111-3(a)(3) (West 2022)) that charges of an offense "[s]et[ ] forth the nature and elements of the offense charged."

¶ 37    Criminal defendants have the fundamental right to be informed of the nature and cause of criminal charges against them. See *People v. Thingvold*, 145 Ill. 2d 441, 448 (1991). To ensure this right, section 111-3 mandates a written criminal charge state the offense's name, the statutory provision allegedly violated, the date and county of the offense, the accused's name, and "the nature and elements of the offense charged." 725 ILCS 5/111-3(a) (West 2022). When facing a challenge to the sufficiency of a charging instrument in a pretrial motion, the trial court must dismiss the information or indictment if that charging instrument fails to satisfy section 111-3, including if that instrument fails to provide all of the offense's elements. *People v. Kidd*, 2022 IL 127904, ¶ 26. Our question, on appeal from an order denying a motion to dismiss an allegedly insufficient charging instrument, is whether that instrument strictly complies with section 111-3. *People v. DiLorenzo*, 169 Ill. 2d 318, 321-22 (1996). If the charging instrument does not comply, the appropriate remedy is to reverse the trial court and remand with directions to dismiss the indictment. See *Kidd*, 2022 IL 127904, ¶ 31. Because the question of whether the trial court properly denied defendant's pretrial motion is a question of law, our review is *de novo*. *People v. Espinoza*, 2015 IL 118218, ¶ 15.

¶ 38    We are not convinced by defendant's argument the failure to adequately supervise cannot be a knowing or reckless act. Defendant provides no case law showing an omission, like inadequate supervision of a child, cannot be committed recklessly or knowingly, but only negligently. Two of defendant's cases, *People v. Gibbs*, 119 Ill. App. 2d 222 (1970), and *People*

*v. Gosse*, 119 Ill. App. 3d 733 (1983), simply provide instances where the conduct of the defendants did not rise to the level of recklessness but did not foreclose charges of recklessness or knowing child endangerment for the failure to supervise. See *Gibbs*, 119 Ill. App. 2d at 224-28; *Gosse*, 119 Ill. App. 3d at 735, 739. In *Gibbs*, a child died after his foster mother failed to close a door to the basement and the child fell down the stairs. *Gibbs*, 119 Ill. App. 2d at 226-27. The facts showed the defendant removed the child from his playpen to allow him to play on the floor. *Id.* at 226. The defendant then went to the basement to put a load of clothes into the washing machine, leaving the door to the basement open. *Id.* at 226-27. The defendant was convicted of reckless conduct. *Id.* at 222. On appeal, the Second District concluded the facts at trial did not rise to the level of reckless conduct and concluded reversal without remand was necessary, as

> "[t]o hold otherwise would be to interpret the statute to mean that if any person were to leave a child in a room, *briefly unattended*, and omitted to close a basement door, whether the child was injured or not, such individual would be guilty, not of negligence, but of the offense of reckless conduct." (Emphasis added.) *Id.* at 231.

In *Gosse*, the court reversed a conviction for reckless conduct upon finding the defendant had not acted recklessly when he attempted a right-hand turn on land used to excavate gravel. *Gosse*, 119 Ill. App. 3d at 735, 739.

¶ 39    Defendant's third case, *People v. Brown*, 2021 IL App (2d) 190181-U, also falls short. In *Brown*, the court affirmed a reckless-conduct conviction for a defendant who injured her daughter while forcing the infant to perform "bicycle kicks." *Id.* ¶¶ 2, 11. In so doing, the *Brown*

court distinguished *Gibbs*, finding "defendant's choice to modify the performance of bicycle kicks was inherently more deliberate than the kind of negligence at issue in *Gibbs*." *Id.* ¶ 43. No language in *Brown* supports the conclusion a lapse in supervision may not be knowing or reckless. In fact, its language distinguishing *Gibbs* indicates insufficient watchfulness is not limited to negligent conduct: "it was thus not ordinary in the same way as insufficient watchfulness *may* be." (Emphasis added.) *Id.*

¶ 40    As the facts elicited at defendant's trial indicated, a failure to supervise may be knowingly or recklessly committed. The decision to allow Paris and her older sibling to roam around the apartment and to do as they pleased until they wore themselves out when in defendant's home may certainly be a knowing or reckless decision. The decision to be on one's phone with the television on as the children had access to other rooms in the house and the ability to climb using a crate may be a knowing or reckless decision that endangered Paris's life or recklessly caused her death.

¶ 41    We find the State's indictment, which alleged the act of failing to adequately supervise Paris, sets forth the elements of the charges made against defendant and, therefore, complies with the mandate of section 111-3(a)(3). Defendant is not entitled to a reversal of her convictions for counts I and III on this ground.

¶ 42                        C. Inconsistent Verdicts

¶ 43    Defendant argues the guilty verdicts for knowingly failing to supervise Paris (child endangerment) and recklessly failing to supervise Paris (reckless conduct) are legally inconsistent and must be reversed, as knowledge and recklessness are "mutually inconsistent culpable mental states." Defendant, citing *People v. Spears*, 112 Ill. 2d 396, 410 (1986), contends simultaneous guilty findings on the mental states of knowledge and recklessness for the

- 14 -

same act against the same victim are legally inconsistent, necessitating a remand for a new trial.

¶ 44        The State counters by first arguing this court should find defendant forfeited this claim. The State maintains defendant did not object to the instructions during the jury-instruction conference and "waited until the arguably inconsistent verdicts were returned" before raising the issue in a posttrial motion. Defendant responds by stating she raised the issue in her motion for a new trial and supported it with the above-cited authority.

¶ 45        Case law establishes forfeiture is not a bar to inconsistent-verdict claims. In *People v. Carter*, 193 Ill. App. 3d 529, 533 (1990), this court rejected a similar claim the defendant's failure to seek "an instruction on inconsistent verdicts at trial" or object "when the verdicts were returned" barred that defendant from seeking relief on appeal. Quoting *Spears* and finding " '[w]hen the jury returned with inconsistent guilty verdicts, the trial judge had a duty to send the jury back for further deliberations consistent with new instructions to resolve the inconsistency,' " we considered the merits of the defendant's claim. *Id.* at 533-34 (quoting *Spears*, 112 Ill. 2d at 410). Other courts have rejected claims of forfeiture upon finding legally inconsistent verdicts are plain error. See, *e.g.*, *People v. Mitchell*, 238 Ill. App. 3d 1055, 1058 (1992) ("Legally inconsistent verdicts present plain error, which is an exception to the general rule that issues not raised in defendant's motion for a new trial are waived."); *People v. Randle*, 213 Ill. App. 3d 1082, 1085 (1991). We thus turn to the merits of defendant's claim.

¶ 46        In support of her argument, defendant relies heavily on *Spears* to prove the verdicts are legally inconsistent. In *Spears*, a jury found the defendant guilty of three charges against his wife based on the same gunshots but with differing levels of intent: attempted murder, armed violence, and reckless conduct. *Spears*, 112 Ill. 2d at 399. The Illinois Supreme Court found the jury improperly concluded defendant acted intentionally, knowingly, and recklessly

but unintentionally at the same time. *Id.* at 403-04. In deciding whether multiple gunshots could support different verdicts, the *Spears* court focused on prosecutorial intent, such as "[t]he manner by which a defendant is charged, and the jury is instructed," as "the essential framework for analyzing the consistency of jury verdicts in the troublesome context of multiple shots or victims" *Id.* 405.

¶ 47　　　　The State, citing *People v. Stroud*, 2023 IL App (2d) 220306, ¶ 24, maintains its theory of the case at trial is germane to whether alleged legally inconsistent verdicts are based on separable acts. The State points to the charges and contends they are based on different acts. Regarding count I, the State maintains it argued defendant knowingly caused or permitted Paris to be placed in circumstances endangering her life, as she knew the condition of her apartment, the child's presence, and the child's "roaming free." The State argues, in contrast, for count III, it argued "defendant committed reckless conduct by consciously disregarding the risk created by the dangerous circumstances."

¶ 48　　　　Upon our review of the record, we find the verdicts on counts I and III are legally inconsistent. "Recklessness and knowledge are mutually inconsistent mental states" (*id.* ¶ 21), but the jury found defendant acted with both mental states when she failed to adequately supervise Paris. As shown in the indictment and in the State's closing argument, the State pursued and secured guilty verdicts for both child endangerment and reckless conduct based on the same act. Both charges identified defendant's failure to supervise as the act defendant committed and the act that caused Paris's death. Count I alleged defendant committed endangering the life or health of a child "in that said defendant, knowingly caused or permitted [Paris], a child under the age of 18 years to be placed in circumstances that endangered [Paris's] life or health in that she *failed to adequately supervise* [Paris] and said circumstances were the

proximate cause of [Paris's] death." (Emphasis added). Count III alleged defendant committed reckless conduct in that she "recklessly caused great bodily harm to [Paris], [a] 2[-]year[-]old child, in that she *failed to adequately supervise* [Paris], thereby causing the death of [Paris] when the act was committed." (Emphasis added).

¶ 49        Moreover, in its closing argument, the State argued the same act, allowing Paris to roam without supervision, supported convictions on both charges. As to count I, the State maintained the following:

> "[Defendant] knew the condition of her apartment. She knew that
> Paris Green was there. As she told the police, she knew that she
> was letting her roam around. She knew that Paris had already
> gotten hurt earlier in the evening when she fell on the crate, and so
> she let her roam free. She knew. You can't live in an apartment
> like that and now know what it is like. She knew."

¶ 50        As to count III, the reckless-conduct count:

> "There's no such thing as letting a two-year-old roam wherever
> they want. There is no such thing as letting a two-year-old roam
> wherever they want in an apartment that is in a condition around
> standing water. It's beyond belief. There's no taking that back.
> And, as has already been indicated, the Defendant had been taking
> care of Paris Green for quite some time off and on. She knew what
> Paris Green was like. She knew that she liked to roam around like
> any two-year-old would. They get into stuff, and still she let her
> roam. Paris had already gotten hurt earlier that day, and she still let

- 17 -

her roam. So, the very definition of Reckless."

¶ 51   The verdicts of child endangerment and reckless conduct based on the same act of a lack of adequate supervision but with differing mental states cannot stand.

¶ 52   We find double jeopardy does not preclude retrial; an argument otherwise is not asserted by defendant. The evidence at defendant's initial trial is sufficient to sustain a verdict on either the reckless-conduct or child-endangerment charges. See *People v. Drake*, 2019 IL 123734, ¶ 20 ("The double jeopardy clause does not preclude retrial when a conviction has been overturned because of an error in the trial proceedings, but retrial is barred if the evidence introduced at the initial trial was insufficient to sustain the conviction."). Accordingly, we reverse defendant's convictions on counts I and III and remand for retrial on those counts.

¶ 53                              D. Effectiveness of Counsel

¶ 54   Defendant last argues she was denied the effective assistance of counsel at trial when her counsel failed to seek the exclusion of testimony by Detective Redpath regarding the alleged third pretrial custodial interrogation. According to defendant, Detective Redpath recorded the conversation but then failed to produce a copy of the recording in discovery after the only copy of said recording was deleted.

¶ 55   The proper remedy for the denial of the effective assistance of counsel is reversal and remand for a new trial. See, *e.g.*, *People v. Parks*, 2025 IL App (4th) 230597, ¶¶ 56, 71. As we have granted this remedy on defendant's surviving claims due to the legally inconsistent verdicts, no further remedy may be given here, and the issue is moot. *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 2016 IL 118129, ¶ 10 ("An appeal is moot *** when events have occurred that make it impossible for the reviewing court to render effectual relief."). We will not consider it. See *id.* (" 'As a general rule, courts of review in Illinois do not decide moot

questions.' " (quoting *In re Barbara H.*, 183 Ill. 2d 482, 491 (1998))).

¶ 56                                  III. CONCLUSION

¶ 57         We reverse defendant's convictions and remand for a new trial on counts I and

III.

¶ 58         Reversed and remanded.